HANAWAY v HANAWAY

Docket No. 152338. Submitted April 19, 1994, at Detroit. Decided January 17, 1995, at 9:00 A.M.

Rosemary Hanaway brought an action in the Oakland Circuit Court, seeking a divorce from John P. Hanaway. The court, Steven N. Andrews, J., granted the divorce and awarded the plaintiff a share of the marital estate, but denied her request for alimony, attorney fees, and costs. The plaintiff appealed, and the defendant cross appealed.

The Court of Appeals *held:*

1. The trial court erred in excluding from the divisible marital estate the defendant's interest in Steel Tex Corporation, a business that was started by the defendant's father and most of whose stock is held by the defendant and his brother. The plaintiff is entitled to an equitable share of the business because the plaintiff, in running the household and caring for the children while the defendant worked long hours at the business during the parties' twenty-four-year marriage, contributed to the acquisition, improvement, or accumulation of the business, and because the business appreciated in value during the marriage. The case must be remanded for an award to the plaintiff of an equitable share of the business.

2. The trial court must decide whether alimony should be awarded to the plaintiff after she receives an equitable share of the family business.

3. The trial court's property division was not rendered inequitable by its consideration of the plaintiff's fault in the breakdown of the marriage.

4. The trial court did not err in refusing to penalize the

REFERENCES

Am Jur 2d, Appeal and Error §§ 839, 868; Divorce and Separation §§ 565, 567, 591, 602, 606, 639, 643, 747, 915-918, 920, 927.

Fault as consideration in alimony, spousal support, or property division awards pursuant to no-fault divorce. 86 ALR3d 1116.

Divorce: excessiveness or adequacy of combined property division and spousal support awards—modern cases. 55 ALR4th 14.

Divorce: excessiveness or adequacy of trial court's property award—modern cases. 56 ALR4th 12.

defendant for his attempt to deflate the value of his stock holdings in the family business.

5. The trial court, after it awards an equitable share of the family business to the plaintiff, must decide whether the plaintiff should be awarded costs and attorney fees.

6. The trial court erred in treating funds taken by the plaintiff from an account in the name of one of the parties' children as an advance against her share of the marital property, given that the plaintiff received no interim alimony or support after filing for divorce, the plaintiff's earnings were inadequate, the defendant's income was substantial, and some of the money taken was used for debts and expenses for which the defendant was jointly liable.

7. The trial court did not err in valuing the defendant's stock holdings in JAR Corporation without regard for tax consequences inasmuch as no sale or other taxable event was planned or contemplated.

Affirmed in part, reversed in part, and remanded.

M.L. STACEY, J., concurring in part and dissenting in part, stated that the trial court properly valued the assets and determined what constituted marital property, but that the case should be remanded for an award of alimony and attorney fees and for an abatement of the trial court's order relating to the plaintiff's return of funds to the marital estate.

1. DIVORCE — PROPERTY DIVISION — APPEAL.

The Court of Appeals, in an appeal from a circuit court's division of marital property in a divorce action, reviews the findings of fact for clear error and decides whether the division was fair and equitable in light of the facts; property disposition rulings will be affirmed unless the Court of Appeals is left with a firm conviction that the division was inequitable.

2. DIVORCE — PROPERTY DIVISION.

Factors to be considered by a circuit court in dividing marital property in a divorce action include: the source of the property; the parties' contribution toward its acquisition, as well as to the general marital estate; the duration of the marriage; the needs and circumstances of the parties; the parties' ages, health, life status, and earning abilities; the cause of the divorce, as well as past relations and conduct between the parties; and general principles of equity; in addition, the court may consider the interruption of the personal career or education of either party.

3. DIVORCE — ALIMONY.

A circuit court deciding whether alimony should be awarded

considers principles similar to those that govern property divisions; the main objective of alimony is to balance the incomes and needs of the parties in a way that will not impoverish either party.

4. DIVORCE — PROPERTY DIVISION — FAULT.

The value to be given to fault in deciding the division of property in a divorce case and the extent to which particular actions are to be regarded as fault contributing to the breakdown of a marriage are matters left to the trial court's discretion, subject to the requirement that the division not be inequitable.

5. DIVORCE — PROPERTY DIVISION — CONCEALMENT OF ASSETS.

A party's attempt to conceal assets is only one of many facts a circuit court must weigh in considering an equitable division of marital property, and it does not give rise to any automatic sanction.

6. DIVORCE — ATTORNEY FEES.

Attorney fees in a divorce action, generally awarded only as necessary to enable a party to prosecute or defend the action, may be authorized when the requesting party has been forced to incur expenses as a result of the other party's unreasonable conduct in the course of the litigation; furthermore, a party should not be required to satisfy attorney fees out of assets relied on for support.

*Chiamp & Associates, P.C.* (by *Carole L. Chiamp* and *Charlene Snow*), for the plaintiff.

*Hyman & Lippitt* (by *Norman L. Lippitt* and *Paul J. Fischer*), for the defendant.

Before: NEFF, P.J., and WHITE and M. L. STACEY,* JJ.

WHITE, J. In her appeal as of right of a divorce judgment, plaintiff contests the circuit court's division of property and claims that she should have been awarded alimony, attorney fees, and costs. Defendant cross appeals the court's valuation of his stock in a business. We affirm in part, reverse in part, and remand.

_____

* Circuit judge, sitting on the Court of Appeals by assignment.

The parties were divorced after twenty-four years of marriage. According to plaintiff's trial testimony, when the parties married in June 1967, she was a twenty-year-old high school graduate who had attended one year of college and was employed. She quit school and work to become a housewife, administering the household physically and financially until late in the marriage. The parties had three children: Caroline, age twenty-three; Christine, twenty-one; and John, Jr., seventeen. Plaintiff testified that she was not satisfied with her life with defendant, mentioning in particular a lack of mutual interests, defendant's emotional distance, defendant's criticisms regarding their sexual relationship, her feeling that defendant did not always have her best interests or those of the children at heart, and a feeling of being manipulated by defendant.

Plaintiff testified that in the first years of their marriage, defendant worked seven days a week and many late hours. She considered him a good provider but not necessarily a good father. She was aware that defendant's father annually had given him shares of stock in Steel Tex, the family business, beginning in 1968, and that their children would also receive stock, though it was her understanding that they were required to work there in order to receive it. Plaintiff testified that some two years earlier, defendant had discussed with her the possibility of selling the company to one of its competitors, indicating that he would be willing to do so for the right price.

In the mid-1980s, one of the daughters required professional counseling. Plaintiff initially merely accompanied her, but eventually sought counseling for herself as well. At the time of trial, December 1991, plaintiff still attended therapy up to three times a week. Plaintiff admitted engaging in an

extramarital sexual relationship that apparently started in 1989. She asserted that this relationship was her only infidelity. However, plaintiff identified the "turning point" in her marriage as occurring earlier: the aftermath of an automobile accident that took place in October 1988, during which time defendant's behavior left her convinced that she could not depend on him. and would be better off on her own.[1]

Plaintiff moved out of the bedroom she had shared with defendant and into her daughter's unoccupied bedroom in January 1990, and subsequently moved into a basement bedroom. She filed for divorce on June 19, 1990, but remained in the house. Defendant filed a countercomplaint for divorce on September 12, 1990. The following year, in May 1991, because of escalating family tensions, plaintiff moved out of the house and into her own apartment.

Until she began considering divorce, plaintiff did not work outside the home. She had attended community college in 1987 and 1988, taking general courses for the purpose of getting a degree. However, after her accident, she apparently did not resume her schooling. In October 1989, plaintiff began working at Kitchen Studio in Birmingham, and accepted the position of general manager with the company some months later. At the time of trial, plaintiff was still employed there and earned $13 an hour, or approximately $27,000 a year. Plaintiff admitted using money that she and defendant had placed in an account in their

---

[1] Plaintiff testified that she was seriously injured in the accident and needed to have her spleen removed. Defendant would not, or could not, provide the necessary authorization for the surgery and it became necessary for another family member to intervene. She also testified that defendant was very late picking her up from the hospital and did not show up until she called him, and that he forgot her clothes although she had reminded him to bring them. He also was unhelpful in having the necessary prescriptions filled.

daughter Christine's name to pay debts that defendant refused to pay after she filed for divorce, including bills for therapy, car insurance, Christmas presents, utilities, and the expenses of establishing a new residence.[2]

Defendant testified that he is the president of Steel Tex Corporation, a family-owned corporation started by his father, Elmer Hanaway. At the time of trial, he owned 41.23 percent of the company, with the remainder belonging largely to his brother, Ron, a vice president. The stock had been given to them by their father over the years with the understanding that they would eventually give it to their children. Defendant intended to honor his father's wishes and had already conveyed some of the stock. He also had involved his children in the family business from the time they were very young, and he encouraged their participation in the business. Caroline was an employee and John, Jr., had also expressed an interest in working in the business. However, defendant also admitted that he had "talked to somebody" about selling the company.

In addition to his Steel Tex holdings, defendant also owned 38.6 percent of a related real estate holding company, the JAR Corporation.

Regarding the marriage, defendant conceded that there was no chance of reconciliation and that divorce should be awarded. Defendant stated that he felt betrayed and deceived by plaintiff's actions and that their marriage began suffering a communication breakdown in the early to mid 1980s. Defendant observed that even before then, plaintiff had been an anxious, excitable, unhappy person with a "bad self-concept," unable to re-

---

[2] Both parties acknowledged that the account was created and placed in Christine's name in order to take advantage of the tax benefits inuring therefrom.

spond to his compliments and encouragements. From the outset, their sex life "never did work very well," and although he generally supported her interest in obtaining counseling, their sexual relationship worsened while plaintiff was in therapy and ceased altogether in 1989. Defendant noted that after plaintiff began working, she chose to. pay the therapy bills herself. Defendant was surprised when plaintiff moved out of the bedroom, because he had already accepted her refusal to have sexual relations with him.

Defendant assessed plaintiff as a good mother—involved in family life, doing some of the housework, cooking and dining with the children, and going on family vacations—until 1985, when she developed outside interests and left the home to socialize with her friends. As her involvement increased, plaintiff spent more and more time away from home, leaving defendant feeling neglected and their children disturbed by her absences.

Ron Hanaway testified that in 1984, he and defendant executed a stock purchase agreement requiring Steel Tex to buy back stock of a departing shareholder so as to keep the stock in the family. The stock was to be purchased at book value. The agreement was amended in November 1991, a month before trial, to change the stock valuation from book to fair market value. Although the change had been considered as early as 1985, and had been drawn up in a proposed amendment in June 1990, Ron delayed signing the modification, along with a related trust agreement, because of concerns about his son. However, Ron admitted that defendant's impending divorce provided an added incentive to execute the modified agreement. Ron acknowledged that he and defendant had discussed a sale of the business with a

competitor who indicated an interest in buying part of the company. However, Ron denied that he and defendant would have sold the company without first seeking their father's approval.

Concerning the value of defendant's businesses, John Stockdale, plaintiff's expert, testified that Steel Tex, which owns two subsidiary companies and employs approximately eighty people, had $10 million in sales in 1990. The book value of Steel Tex common stock on September 30, 1990, was $5,199,697, with defendant's share of the company being worth $2,040,000.[3] Stockdale's analysis of the company's fair market value was $4,177,000; with defendant's share valued at $1,527,000.[4] Stockdale viewed as inflated the executive salaries paid by the company, and adjusted their value downward and the company's value upward to compensate. He also used what he acknowledged was an unusually low figure of five percent in assessing the appropriate discount for marketing difficulties in light of defendant's status as a "control group" shareholder and the stock purchase agreement.

Edward Phillips, the Hanaway family accountant, testified that the marital estate's net worth was $1,697,331, including defendant's 41.23 percent share of Steel Tex, worth $480,000. Phillips testified that defendant earned $371,094 from Steel Tex in 1989, $331,097 in 1988, $324,890 in 1987, $246,200 in 1986, and $258,800 in 1985. A figure for 1984 was not available, but tax returns indicated that defendant earned $153,380 in 1983, $113,360 in 1982, $116,220 in 1981, and $110,144 in 1980. Phillips acknowledged that the approxi-

[3] Stockdale computed the value of defendant's share on the basis of a 41.31 percentage figure that he obtained from defendant's answers to interrogatories. It appears that the correct percentage is 41.23.

[4] See n 3, *supra*. While Stockdale began recomputing his figures using the correct percentage of 41.23, no final figures for the value of defendant's share were presented.

mate tripling of defendant's income in the last decade signified vigorous corporate growth during that period, but felt that the company had reached its peak and would not continue to grow unless it diversified. Phillips used a higher discount factor than did Stockdale, considered tax implications, and did not adjust the officers' compensation figures, which he considered reasonable in light of their contribution to the company.

Phillips was aware of both the original stock purchase agreement and the amendment that provided for repurchase at fair market value. He testified that the amendment was not executed in 1990, when it had been prepared, because Ron Hanaway did not transfer shares to his children as he had planned. In November 1991, Ron called Phillips, indicating that he wanted to make the transfers to his children, and that he was concerned that the book value of the company was greater than fair market value. The amended agreement was then signed. Phillips admitted that, when Ron raised the subject, he was also concerned about defendant's health and impending divorce; subsequently, the financial effect on the corporation of enforcing the buy-sell agreement at book value was also discussed.

Defendant, his brother Ron, and Phillips all testified that a provision in the agreement allowing defendant and Ron to assign an interest in Steel Tex stock to a spouse or to transfer stock to a trust created for their own benefit was inconsistent with the express wishes of Elmer Hanaway. Defendant and Phillips postulated that the provision was a drafting error.

The parties stipulated that the value of JAR Corporation was $1,349,000.

The trial court found that the marriage was "less than successful from the start" and failed to

adequately meet the parties' emotional and physical needs. The court found plaintiff at fault for the ultimate breakdown because she had taken a lover, ceased sexual relations with defendant, and later moved into a separate bedroom and then into the basement, finally leaving the marital home altogether. The court found that there was no reasonable likelihood the marriage could be preserved.

The court reviewed the parties' respective employment, incomes, and assets, averaging defendant's income from 1980 through 1989 at $230,696 and from 1985 through 1989 at $311,528. It summarized the parties' marital assets, which included the marital home, valued by the court at $312,500,[5] with a net equity of $148,500; furniture and furnishings, the division of which the parties had already agreed on; various vehicles; gold Krugerrands with a stipulated value of $15,000; jewelry; a joint investment account worth $663,956.50 on October 27, 1991; an annuity account belonging to defendant worth $45,831.45 on September 30, 1991; a money market account belonging to plaintiff worth $9,948.80 on October 11, 1991; a checking account belonging to defendant with a balance of $4,000; individual retirement accounts with a net value of $29,762.24 (plaintiff's) and $54,220.58 (defendant's), both on October 27, 1991; investment property with a net value of $138,000; and an outstanding debt of $50,000 incurred by defendant. The court also found that the parties had $39,000 in their daughter Christine's name, most of which plaintiff spent after filing for divorce. The court noted that the funds in plaintiff's money market account included what was left from Christine's account.

---

[5] The court relied on the testimony of defendant's appraiser, comparing his thirty-five-year experience as an appraiser to that of plaintiff's appraiser, two years in real estate sales.

The court addressed separately defendant's interests in Steel Tex and JAR Corporation. Concerning Steel Tex, it found that defendant's father, originally the sole shareholder, had given defendant and his brother Ron most of the company's common stock with the wish that they eventually give it to their children, and that defendant and his brother had transferred a portion of the stock to trust funds for their children.

In so finding, however, the court rejected defendant's claim that he had a contractual obligation to transfer the stock to his children, inasmuch as the 1984 stock purchase agreement expressly permitted a stock transfer to a spouse, and also because defendant and his brother had at one time "negotiated" with a third party for a sale of the company. The court also described the November 1991 amendment of the stock purchase agreement as "a deliberate attempt to deflate the value of the stock," which the court "could not let . . . pass unnoticed." Nonetheless, while summarizing the figures for the net value of defendant's Steel Tex interest offered by both Stockdale and Phillips, the court did not itself determine the value of that interest.

The court determined that the fair market value of defendant's interest in JAR Corporation was $359,720.[6] In making that determination, the court rejected the 32.6 percent reduction in value proposed by Phillips to account for tax consequences in the event of a sale, noting that there was no evidence that a sale or other taxable event was planned or contemplated.

In dividing the property, the court stated that, although defendant's income and earning capacity

[6] Although this was the figure set forth at trial by plaintiff's expert, Stockdale, defendant's expert, Phillips, accepted that figure as well after discovering that he had relied on an erroneous figure.

were far greater than plaintiff's, both parties were employed and able to support themselves. The court also stated that all of the parties' marital assets had been acquired during their twenty-four-year marriage. Considering those circumstances, as well as its assessment of fault, the court found that a 60/40 split would be reasonable and equitable. It awarded plaintiff these assets:

(1) Furniture and furnishings as stipulated;

(2) Her car(s), value unspecified;

(3) Her money market account ($9,948);

(4) Her IRA account ($29,762);

(5) The investment property ($138,000);

(6) A 1956 Ferguson tractor (estimated value $1,000)

as stipulated;

(7) Her clothing, jewelry, and other personal property in her possession;

(8) Any pension, profit-sharing, or retirement benefits in her own name.

Defendant was awarded:

(1) The marital home, by stipulation ($148,500);

(2) Furniture and furnishings as stipulated;

(3) His car(s), value unspecified;

(4) His boats ($15,500);

(5) The gold Krugerrands ($15,000);

(6) The joint investment account ($663,957);

(7) His annuity account ($45,831);

(8) His checking account ($4,000);

(9) His IRA account ($54,221);

(10) His interest in JAR Corporation ($359,720);

(11) His clothing, jewelry, and other personal property in his possession;

(12) Any pension, profit-sharing, or retirement benefits in his own name.

Recognizing that the awards represented a 88/12 split of assets whose monetary value had been

placed in evidence (excluding the Steel Tex stock), the court required defendant to pay an additional $415,465, representing twenty-eight percent of the total assessed value. That figure was then reduced by $30,613, representing the amount that the court found plaintiff had taken from the marital estate for her own use from the account in Christine's name,[7] to $384,852.

The court ruled that defendant was to bear sole responsibility for his $50,000 debt to his father, and any joint indebtedness incurred during the marriage for family maintenance. However, the parties were to be responsible for their own individual debts. Pursuant to the parties' stipulation, defendant would also provide plaintiff with medical coverage for a period of three years.

The court ruled that it would not distribute defendant's stock in Steel Tex as part of the marital estate, regarding it as a personal gift to defendant from his father, and stated:

> There is no evidence that plaintiff contributed to its acquisition, improvement or accumulation, and, in light of the fact that plaintiff is to receive over $560,000 in cash and other assets, the exclusion of the stock from the estate will not result in an award which is insufficient to maintain her. Accordingly, defendant shall receive his Steel Tex stock as his sole and separate property.

The court also declined to award either party alimony. The court stated that, although plaintiff had requested alimony, she had presented little evidence regarding her monthly living expenses and none regarding her maintenance require-

---

[7] The court noted that plaintiff had actually spent $32,317, but that this sum included $3,408 for past-due debts for which each party was to bear equal responsibility. The court thus subtracted defendant's share of the debts, $1,704.

ments. Stating that plaintiff was in good health, working, and earning an "above-average wage," and reiterating that plaintiff would receive over $560,000 in cash and other assets, the court found no basis for awarding alimony.

Regarding attorney fees, although plaintiff had requested contribution from defendant, the court did not award them, stating, "[S]he has presented no evidence as to the amount of those fees or, more important, that she has been and is unable to bear the cost alone."

Finally, the court ruled that the parties would have joint legal custody of John, Jr., with defendant having physical custody. Pursuant to the parties' stipulations, John could choose to live with plaintiff, but would, in any event, be supported entirely by defendant, barring a change in circumstances.

Plaintiff subsequently moved for a new trial on the issues of alimony and attorney fees, submitting her monthly living expenses and maintenance requirements,[8] as well as figures for professional fees, including expert witness fees of $23,349 and attorney fees of $53,712, incurred in this litigation. The trial court denied the motion. Concerning the issue of alimony, it stated that the parties' former standard of living is but one factor to be considered, and that on the basis of the evidence, the

---

[8] Plaintiff's motion focused on the disparity between the parties' incomes, as well as that between her monthly income and expenses. While acknowledging that the court's disposition awarded plaintiff additional cash and assets, the pleadings also asserted that under the terms of the court's ruling, the cash and assets would be unavailable to plaintiff until six months after the judgment was final, and afforded defendant the additional latitude of postponing payment thereafter with only a "minor interest charge of 7.5%" as a penalty. However, on October 21, 1992, the court issued an order garnishing defendant's investment account for the amount of $402,407.76, representing the amount owed plaintiff, plus $17,555.76 in interest. It appears that the matter was resolved within two days (on October 23, 1992) though in an unspecified fashion.

court found that plaintiff was able to maintain a reasonable standard of living without defendant's assistance. Concerning attorney fees, it stated that plaintiff had not submitted evidence relevant to the issue, other than that she, her attorney, and her experts put considerable time into discovery. Because plaintiff had not demonstrated either that she was financially unable to bear the costs of litigation or that defendant's conduct had exacerbated her fees, the court found no basis for amending its prior order.

I

Plaintiff first argues that the Steel Tex stock, and its appreciation, should have been included as marital assets because plaintiff contributed to the company's development and improvement by remaining at home to care for the house and children while defendant applied himself to the company. Plaintiff contends that the court's failure to include Steel Tex stock in its calculations yielded an actual 80/20 property division in favor of defendant.

In reviewing a dispositional ruling in a divorce case, we first review the trial court's findings of fact for clear error and then decide whether the dispositional ruling was fair and equitable in light of the facts. *Sands v Sands,* 442 Mich 30, 34; 497 NW2d 493 (1993); *Sparks v Sparks,* 440 Mich 141, 151-152; 485 NW2d 893 (1992). Property disposition rulings will be affirmed unless we are left with the firm conviction that the distribution was inequitable. *Id.*

Although divisions of property are not governed by any set rules, certain principles nonetheless apply. Among the equitable factors to be considered are the source of the property; the parties'

contributions toward its acquisition, as well as to the general marital estate; the duration of the marriage; the needs and circumstances of the parties; their ages, health, life status, and earning abilities; the cause of the divorce, as well as past relations and conduct between the parties; and general principles of equity. *Sands, supra* at 35; *Sparks, supra* at 159-160. In addition, the court may consider the interruption of the personal career or education of either party. *Sands, supra* at 36.

Here, while the trial court clearly considered many of these factors, its determination that plaintiff had not contributed to Steel Tex's "acquisition, improvement or accumulation" is particularly in issue.

We are unable to agree with the court that plaintiff made no contribution to the company's assets or appreciation. The trial testimony indicates that plaintiff administered the household physically and financially and cared for the children until late in the marriage, while defendant, the company president, devoted himself to the business, working long work weeks. The business clearly prospered during the marriage. While the source of defendant's interest in the company was his father's annual gifts of stock, the financial yield over time from that interest and the increased value of that interest necessarily reflected defendant's investment of time and effort in maintaining and increasing the business, an investment that was facilitated by plaintiff's long-term commitment to remain at home to run the household and care for the children.

Although initially given to defendant by his father, the interest in the business was a major asset of the marriage that defendant was permitted to cultivate and nurture over the years. It is

inequitable to deprive plaintiff of any share of the business or its value on the basis that she enjoyed the benefits of defendant's salary over the years. The fruits of defendant's efforts in the business were both the increase in the value of the business since 1968 and the salary he drew over the years. The parties were building an asset as well as enjoying its fruits on an ongoing basis. That plaintiff's contribution to the asset came in the form of household and family services is irrelevant. The marriage was a partnership. The couple nurtured a business and three children, and watched all four grow. Defendant does not claim that he could have done it all himself. In contrast to *Grotelueschen v Grotelueschen,* 113 Mich App 395; 318 NW2d 227 (1982), cited by the trial court, the asset at issue did not increase in value simply by earning interest. Rather, it appreciated because of defendant's efforts, facilitated by plaintiff's activities at home. See *McNamara v McNamara,* 178 Mich App 382, 391; 443 NW2d 511 (1989).

We thus conclude that, viewed from the standpoint of whether plaintiff contributed to the acquisition, improvement, or accumulation of the property, or from the standpoint of whether the property appreciated in value during the marriage,[9] see *Rickel v Rickel,* 177 Mich App 647, 655; 442 NW2d 735 (1989); *Gregg v Gregg,* 133 Mich App 23, 29-30; 348 NW2d 295 (1984), the trial court erred in treating Steel Tex as defendant's sole and separate property. Accordingly, we reverse the trial court's judgment with regard to this issue, and remand with instructions to award plaintiff an equitable share of the business. We note that the court need

[9] Defendant argues that plaintiff failed to present the requisite proofs concerning the appreciation in the value of the business. However, plaintiff established that defendant's income from the business increased from $110,000 to $330,000 from 1980 to 1989. This demonstrates substantial appreciation.

not award plaintiff stock in the business, and may award a sum of money or other assets out of the marital estate representing her equitable share of the business.

II

A related issue is whether the trial court erred in declining to grant alimony. In contending that alimony should have been awarded, plaintiff cites the duration of the marriage, her viability in the labor force as compared with defendant's, and the ultimate disparity in the standard of living that plaintiff expects to encounter.

Principles similar to those of property distribution apply in determining whether to award alimony. *Ianitelli v Ianitelli,* 199 Mich App 641, 642-643; 502 NW2d 691 (1993); *Demman v Demman,* 195 Mich App 109, 110-111; 489 NW2d 161 (1992). *Ackerman v Ackerman,* 163 Mich App 796, 803; 414 NW2d 919 (1987). The main objective of alimony is to balance the incomes and needs of the parties in a way that would not impoverish either party, *Ackerman v Ackerman,* 197 Mich App 300, 302; 495 NW2d 173 (1992).

In its original opinion, the trial court indicated that alimony would not be granted because plaintiff presented little evidence regarding her monthly living expenses and none regarding her maintenance requirements, because she was in good health, working, and earning an "above-average wage," and also because she would receive over $560,000 in cash and other assets. In its subsequent denial of plaintiff's motion for a new trial, the court found that plaintiff had not demonstrated that the amount awarded her was inadequate to support a reasonable standard of living.

Plaintiff's information concerning monthly ex-

penses and maintenance requirements, submitted after trial, established that she could not maintain herself exclusively on her monthly income, which was considerably less than defendant's, on which the parties had formerly maintained an affluent lifestyle. Even without this evidence, we believe plaintiff presented a strong case for alimony given the length of the marriage, the parties' lifestyle during the marriage,[10] plaintiff's $27,000 income and defendant's $371,000 income. With regard to the trial court's determination that plaintiff's income, augmented by cash and other assets worth over $560,000, enabled her to maintain a reasonable standard of living without defendant's assistance, we believe the court put too much weight on the value of the property awarded to plaintiff. In a situation such as this, where both parties are awarded substantial assets, the court, in evaluating a claim for alimony, should focus on the income-earning potential of the assets and should not evaluate a party's ability to provide self-support by including in the amount available for support the value of the assets themselves. Given the length of the marriage, the magnitude of the marital estate, and defendant's capital position and earning potential after the divorce, plaintiff should not be expected to consume her capital to support herself.

Plaintiff has asked that we remand for an award of alimony with instructions to the court that alimony should be no less than a specified amount. However, in view of the fact that on remand the court will be awarding plaintiff an additional sum representing her equitable share of the value of the business, we are unable to determine an appropriate alimony award at this time. On remand, the

[10] The parties' 1989 tax return reported a gross adjusted income of $608,000.

court shall consider the applicable factors, *Demman, supra; Ackerman,* 163 Mich App 803, taking into account both parties' circumstances after the additional property award to plaintiff, and, in considering plaintiff's needs and circumstances, shall consider plaintiff's wages and the income she can earn from the property awarded to her, with due regard for the nonincome-producing nature of any assets.

### III

Plaintiff next argues that, in determining the division of marital assets, the trial court assessed fault inequitably, overlooking evidence of defendant's fault and overemphasizing her own, while ignoring other necessary factors in reaching an equitable settlement.

The relative value to be given the fault element in a particular case and the extent to which particular actions are regarded as fault contributing to the breakdown of a marriage are issues calling for a subjective response; such matters are left to the trial court's discretion subject to the requirement that the distribution not be inequitable. The trial court is in the best position to determine the extent to which each party's activities contributed to the breakdown of the marriage. In dividing the property, the trial court properly considered plaintiff's conduct as "one factor among many," *Sparks, supra* at 163, and specifically addressed the duration of the marriage, and the needs and circumstances of the parties, including health and earning capacities, in addition to fault. While we would not have penalized plaintiff to the extent of a twenty percent differential in the property distribution, we are unable to say that the distribution was inequitable on this ground alone.

IV

Plaintiff next argues that the trial court, having found that the November 1991 amendment of the stock purchase agreement was "a deliberate attempt to deflate the value of the stock," should have sanctioned defendant accordingly. However, while the court denounced defendant's behavior as conduct that could not be condoned, it stopped short of finding that it was "devious and deceptive conduct" undertaken with the intent of misleading the court. *Sands, supra* at 36. Moreover, a party's attempt to conceal assets, while relevant in considering an equitable division of marital property, is only one of many facts the court must weigh, and it does not give rise to any automatic sanction. *Id.* at 36-37. We conclude that the court did not err in failing to penalize defendant on this basis.

V

Plaintiff argues that she should have been awarded attorney fees, because of the great disparity in income and defendant's attempt to deflate the value of the stock.

Attorney fees in a divorce action are awarded only as necessary to enable a party to prosecute or defend a suit, and this Court will not reverse the trial court's decision absent an abuse of discretion. *Maake v Maake,* 200 Mich App 184, 189; 503 NW2d 664 (1993). Attorney fees also may be authorized when the requesting party has been forced to incur expenses as a result of the other party's unreasonable conduct in the course of litigation. *Milligan v Milligan,* 197 Mich App 665, 671; 496 NW2d 394 (1992). A party should not be required to invade assets to satisfy attorney fees when the party is relying on the same assets for support. *Maake, supra* at 189.

Plaintiff has not established that defendant's attempt to change the value of his stock in Steel Tex from book value to fair market value hindered plaintiff in discovering the value of those assets and forced her to incur greater expense than she otherwise would have incurred. We note that this argument was not raised before the trial court in plaintiff's motion for a new trial (which emphasized instead the cost of professional fees in general and defendant's easier access to information about the parties' assets in particular).

Nevertheless, we conclude that the failure to award attorney fees was an abuse of discretion, given the trial court's distribution of property and failure to award alimony. Plaintiff could not have been expected to satisfy her considerable attorney and expert fees and costs out of her $27,000 salary, and should not have been required to invade principal to pay these fees, given defendant's considerable property and earnings.

However, in view of our reversal and remand regarding the alimony and property issues, we are unable to determine whether an award of attorney and expert fees and costs will be appropriate. On remand, the court shall consider the matter anew. The court shall not require plaintiff to pay attorney fees out of any property that the court treats as available to produce income. Of course, if the court's award of alimony and property on remand leaves the parties with assets and income comparable to one another, an award of fees would be inappropriate.

VI

Plaintiff argues that the trial court erred in reducing her share of the assets by $30,613, the amount she spent because defendant refused to

pay certain expenses that should have been paid from marital assets. We agree.

The trial court determined that in appropriating the $39,000 in the account in Christine's name, plaintiff advanced herself a portion of the marital estate that otherwise would have been available for distribution, and spent most of it. According to plaintiff's testimony at trial, she used some of the money to pay therapy and other medical bills, some to establish herself in a new residence,[11] some to pay joint debts and utility bills, some to buy Christmas presents for the children, and retained approximately $9,000 at the time of trial. The trial court allowed plaintiff to keep the unspent remainder, subtracted from the amount spent the amount for which defendant bore a shared responsibility, and treated the $30,613 that it determined that plaintiff spent for her own needs as an advance against her final award.

Under the circumstances that plaintiff received no interim alimony and no other contributions from defendant or the marital estate toward her support after filing for divorce, that her earnings were inadequate for her support, and that defendant had substantial income, it was inequitable to treat any amounts other than the $9,000 still retained by plaintiff as an advance against her final award.[12]

VII

Defendant raises one issue in his cross appeal: whether the trial court erred in valuing his JAR Corporation stock without considering tax consequences. In light of the court's determination that

---

[11] Plaintiff testified that she had been instructed by defendant and his lawyer not to remove any property from the marital home.

[12] That plaintiff had undertaken to pay her own therapy bills at a time when she was living in the marital home is irrelevant. Her circumstances and needs clearly had changed.

no sale or other taxable event was planned or contemplated, we find no clear error or abuse of discretion in its decision not to discount the stock value in anticipation of such consequences. *Nalevayko v Nalevayko,* 198 Mich App 163, 164; 497 NW2d 533 (1993).[13]

## VIII

Affirmed in part, reversed in part, and remanded for further proceedings. We do not retain jurisdiction.

NEFF, P.J., concurred.

M.L. STACEY, J. *(concurring in part and dissenting in part).* I would affirm the trial court's decisions regarding valuation of assets and what constitutes marital property.

I would, however, remand the case to the trial court with instructions that it:

1. Order alimony in a suitable amount, after a hearing regarding all applicable factors relating to the determination of alimony;

2. Award plaintiff appropriate attorney fees; and

3. Abate its order relating to the return of funds to the marital estate by plaintiff.

---

[13] The cases cited by defendant do not mandate a contrary result. In *Everett v Everett,* 195 Mich App 50; 489 NW2d 111 (1992), concerning stock *options* (which are subject to expiration, see *id.* at 54), the trial court clearly erred in failing to consider tax consequences because the options would be taxed when exercised, *id.* at 55, and because *the plaintiff in that case asked the trial court to value the options under the assumption that all the options would be exercised. Id.* at 53. In *Lesko v Lesko,* 184 Mich App 395; 457 NW2d 695 (1990), the banked sick time had no value unless a taxable event occurred. It is not argued that defendant's interest in JAR Corporation had no value except if it were sold. Neither *Burkey v Burkey (On Rehearing),* 189 Mich App 72; 471 NW2d 631 (1991), nor *Kilbride v Kilbride,* 172 Mich App 421; 432 NW2d 324 (1988), addressed tax consequences. Finally, even the extrajurisdictional case cited by defendant does not mandate consideration of tax consequences, but merely indicates that a trial court *could* reasonably consider and adopt an expert's opinion that stock values should be reduced by a future tax. *Liddle v Liddle,* 140 Wis App 2d 132; 410 NW2d 196 (1987).