# STATE OF MICHIGAN

# COURT OF APPEALS

JULIANNE ALLISON,

Plaintiff-Appellee,

v

GREGORY ALLISON,

Defendant-Appellant.

UNPUBLISHED
June 13, 2017

No. 330997
St. Clair Circuit Court
Family Division
LC No. 14-002381-DO

Before: JANSEN, P.J., and MURPHY and BORRELLO, JJ.

PER CURIAM.

Defendant appeals as of right the parties' judgment of divorce, challenging the trial court's 60/40 distribution of the marital estate in favor of plaintiff and the trial court's decision to consider as marital property defendant's shares in BTM Corporation (BTM), as well as any increase in value of defendant's 25% interest in Sawdon-Allison Building Company (Sawdon-Allison). We affirm.

"In a divorce action, this Court reviews for clear error a trial court's factual findings on the division of marital property and whether a particular asset qualifies as marital or separate property." *Hodge v Parks*, 303 Mich App 552, 554-555; 844 NW2d 189 (2014). "A finding is clearly erroneous if, after a review of the entire record, the reviewing court is left with the definite and firm conviction that a mistake was made." *Woodington v Shokoohi*, 288 Mich App 352, 355; 792 NW2d 63 (2010). "If the trial court's findings of fact are upheld, the appellate court must decide whether the dispositive ruling was fair and equitable in light of those facts." *Id*. "The court's dispositional ruling should be affirmed unless this Court is left with the firm conviction that the division was inequitable." *Pickering v Pickering*, 268 Mich App 1, 7; 706 NW2d 835 (2005).

Defendant first argues that the trial court's 60/40 distribution of the marital estate in plaintiff's favor was inappropriately punitive. According to defendant, the trial court placed a disproportionate amount of weight on the parties' respective fault, while ignoring defendant's significant financial contributions to the marital estate. We disagree.

The goal in distribution of the marital estate in a divorce action is equity in light of all the circumstances. *Richards v Richards*, 310 Mich App 683, 694; 874 NW2d 704 (2015).

-1-

Mathematical equality is not required, but "any significant departure from congruence must be clearly explained." *Berger v Berger*, 277 Mich App 700, 717; 747 NW2d 336 (2008). The court must consider all relevant factors, but may not assign disproportionate weight to any one circumstance. *Id*. Specifically, in determining what is equitable, a trial court should consider each party's age, health, needs, station in life, and earning capacity; the length of the marriage; contributions to the marital estate; fault of the parties; and other equitable circumstances. *Butler v Simmons-Butler*, 308 Mich App 195, 208; 863 NW2d 677 (2014). This list of factors is nonexhaustive, and the trial court may choose to consider additional factors relevant to a particular case. *Richards*, 310 Mich App at 694. "Marital misconduct is only one factor among many and should not be dispositive." *Sparks v Sparks*, 440 Mich 141, 163; 485 NW2d 893 (1992). Trial courts must consider fault in conjunction with all other relevant factors, and may not impose an inequitable division of property as a punitive response to fault. *Hanaway v Hanaway*, 208 Mich App 278, 297; 527 NW2d 792 (1995). When considering the parties' contributions to the marital estate, the financial contributions need not be equal. A nonwage earning spouse can make substantial nonfinancial contributions to the marital estate by maintaining the marital household and caring for the parties' children. *Woodington*, 288 Mich App at 366. Additionally, "the court may choose to consider the interruption of the personal career or education of either party." *Richards*, 310 Mich App at 694, quoting *Sparks*, 440 Mich at 160.

Upon review of the record, we are not left with a definite and firm conviction that the trial court's findings were erroneous or that its distribution of the marital estate was inequitable. The trial court properly weighed all of the relevant factors before reaching its conclusion regarding equitable distribution. The trial court noted that the parties, each 52 years of age, had been married for close to 30 years and were both in good health. During the marriage, plaintiff maintained the household and attended to the parties' two children. Defendant worked, often times over 40 hours per week, at BTM and Sawdon-Allison, two companies in which defendant maintained an ownership interest. Defendant's annual salary and bonuses from BTM of close to $200,000, supplemented by annual distributions from both BTM and Sawdon-Allison, supported an upper middle class lifestyle for both parties for the majority of their marriage. Over 29 years, the parties accumulated considerable assets contributing to the marital estate. Most, if not all, of the parties' assets were purchased with defendant's earnings.

Although defendant suggests that the trial court failed to consider his significant contributions to the marriage, the record does not support defendant's suggestion. To the contrary, the trial court specifically noted that defendant "was the person who worked for the majority of the income that the marriage received." However, the trial court also noted that plaintiff's contributions at home facilitated defendant's ability to work long hours for two different companies. If it were not for plaintiff taking on the child-rearing responsibilities and maintaining the marital home, defendant would have been unable to devote as much time to working not only as an employee of BTM, but also as a part owner of both BTM and Sawdon-Allison. The trial court properly concluded that on the matters of age, health, needs, and contributions, the parties were relatively equal.

The trial court also properly considered the parties' stations in life and relative earning capacities, noting first that defendant's circumstances were changing for reasons extrinsic to the divorce. Specifically, BTM and Sawdon-Allison had recently sold, and defendant was required

to sign a non-compete agreement limiting his ability to work for a similar company. Defendant's employment at BTM was unexpectedly terminated after the sale, and defendant was unemployed at the time of the divorce proceedings. Distributions from the sale proceeds were still in dispute. Plaintiff was working part-time and receiving about $17,000 per year. The trial court properly concluded that these factors weighed relatively equally in favor of each party, but noted some disparity in the parties' future earning capacity:

> Clearly [defendant] has a longer work record that [plaintiff] and based upon that work experience could obtain employment but for the non-compete agreement. The defendant has no college degree but does have skills developed over the years that would allow him to transition to new employment in a non-manufacturing position. [P]laintiff has no degree and her only work history has been in a clerical position. Although she may be able to increase her hours in the future, it will not raise her ability to earn to any great extent. Thus, both parties at present find themselves in a position of having to live off assets acquired during the marriage with some supplement from greatly reduced earning potential.

Notably, the disparity in earning capacity originated by mutual agreement of the parties. Before the marriage, plaintiff was employed in a clerical position at a manufacturing company, and left her position to attend the household with defendant's agreement, after the parties' first child was born.

Finally, the trial court considered the matter of fault, concluding that defendant's extramarital affair and his refusal to end it caused the breakdown in the parties' marriage. The trial court noted that the parties were not suffering from problems other than those "typical in many marriages," prior to defendant's decision to engage in his affair. When plaintiff learned of the affair, she told defendant that she was willing to try and preserve the marriage if defendant broke off his extramarital relationship. Defendant refused. Based on the totality of circumstances, including fault, the trial court determined that a 60/40 division of the marital estate in plaintiff's favor was equitable.

Defendant takes no issue with the trial court's finding that defendant's extramarital affair was the reason for the divorce, or its finding that defendant was at fault for the breakdown of the parties' marriage. However, defendant argues that the trial court erred when it assigned a disproportionate weight to the issue of fault and awarded plaintiff more than half of the marital estate. The matter of fault has been given disproportionate weight when it is the only "true justification" for a divergence from congruent distribution, or when the trial court's comments suggest that its property division is intended to punish one of the parties for specific conduct. See *Berger*, 277 Mich App at 721. The record here does not support either circumstance, and we are therefore not definitely and firmly convinced that the trial court disproportionately weighed the matter of defendant's fault when it divided the parties' marital estate 60/40. As previously discussed, the trial court considered the issue of defendant's fault as but one factor among many, and its decision to award plaintiff 60 percent of the marital estate was based on considerations other than defendant's conduct:

> It is clear to this court that the plaintiff and the defendant were married for nearly 30 years and that the defendant earned a considerable income in his family

business. This made it unnecessary for the plaintiff to pursue a career of her own and the parties agreed that she should remain a stay at home mother caring for the children while the defendant continued to earn the money for the family. After 29 years of marriage the plaintiff was faced with defendant's infidelity and was forced to either accept the fact that he had been unfaithful, knowing from his own statement to her that he would continue to be unfaithful, and stay with the defendant and the financial security that she was used to, or to file a complaint for divorce even though she is not financially independent and is essentially unprepared to become so. Because the defendant's infidelity caused the plaintiff to be in this position the court has determined that it is equitable to divide the assets of the marriage, with the exception of the interest [in BTM and Sawdon-Allison] in such a manner that approximately 60% is awarded to the plaintiff.

Nothing in the record suggests that the trial court's distribution was imposed as punishment for defendant's behavior. To the contrary, the trial court's determination reflects an understanding of the difficult situation plaintiff now faces as a single woman, after 30 years of marriage, with no formal education and very little work experience. The parties' respective stations and future earning capacities, especially considering the length of the marriage, were factors properly considered by the trial court in reaching an equitable distribution of marital assets. The trial court noted that defendant maintained the capacity to generate a larger income, having a greater history of and training for employment. The trial court's distribution of property was equitable in light of this disparity in earning potential, as well as the trial court's decision to reserve the issue of alimony.

Further, while the trial court ultimately diverged from a congruent distribution of marital assets, defendant's fault was not the only justification for this departure. The trial court also properly considered the fact that during the divorce proceedings, defendant began hiding cash from plaintiff by "altering direct deposits from his paycheck[.]" In total, roughly $128,000 was unaccounted for over an 11-month period. Defendant also made the following cash purchases: a 2015 Polaris Ranger for $14,334; a moped for $2,339; a trailer for $2,562; and a storage unit for $80 per month. Defendant sold two vehicles during the divorce proceedings, and was required to give plaintiff half of the proceeds from those sales. Defendant pocketed the cash from the sales and wrote plaintiff checks from the marital account, essentially giving plaintiff money that was already hers. Defendant also spent marital funds on hotel rooms and expensive jewelry for his mistress. Based on the foregoing, we are not definitely and firmly convinced that the trial court's 60/40 division of the marital estate was inequitable.

Defendant next argues that his 25% partnership interest in Sawdon-Allison and his 8.184% ownership interest in BTM were separate assets, and therefore, the trial court erroneously awarded plaintiff half of defendant's pro rata share of the June, 2015 sale of both companies. We disagree.

"In any divorce action, a trial court must divide marital property between the parties and, in doing so, it must first determine what property is marital and what property is separate." *Cunningham v Cunningham*, 289 Mich App 195, 200; 795 NW2d 826 (2010). "[T]he marital estate is divided between the parties, and each party takes away from the marriage that party's own separate estate with no invasion by the other party. *Reeves v Reeves*, 226 Mich App 490,

-4-

494; 575 NW2d 1 (1997). "Generally, marital property is that which is acquired or earned during the marriage, whereas separate property is that which is obtained or earned before the marriage." *Cunningham*, 289 Mich App at 201, citing MCL 552.19. However, property that a spouse acquires during the marriage by inheritance or gift is considered to be separate property. *Dart v Dart*, 460 Mich 573, 585; 597 NW2d 82 (1999). Separate property can lose its separate character and become marital property when commingled with marital property, or treated as marital property. *Cunningham*, 289 Mich App at 201-202. Further, the appreciation of separate property is included in the marital estate if both parties contribute to the gain in value. *McNamara v Horner*, 249 Mich App 177, 184-185; 642 NW2d 385 (2002). Appreciation is not considered marital property when the gain in value is wholly passive. *Id*.

We first address the trial court's determination that 25% of the difference in value of Sawdon-Allison from the date defendant acquired an interest in the company until the date of its sale was marital property subject to division. Defendant acquired his 25% partnership interest in Sawdon-Allison in 1993, during the parties' marriage. The interest was a gift from defendant's mother, who at the time shared equal ownership interests with defendant's father and two other individuals. The trial court found defendant's 25% interest in Sawdon-Allison "at the time of the gift from his mother in 1993 was separate property from the marital estate." Nevertheless, the trial court went on to find that "the difference in the value of [defendant's] 25% interest that has accumulated since 1993 is not a passive accumulation in value but directly attributable to [defendant's] work on behalf of [Sawdon-Allison] as he was required to do under the partnership agreement." Further, the trial court determined that

> defendant's ability to perform his obligation to [Sawdon-Allison] was facilitated by [plaintiff's] work in maintaining the home and family and thereby freeing [defendant] from his attention to those details of everyday life of a family. Even though [defendant's] 25% interest has never been transferred to be owned jointly between him and [plaintiff] and is property owned by [defendant], plaintiff has contributed to the improvement and accumulation of the property as a result of her efforts in tending to the family in support of [defendant's] active involvement with the company.

We find no clear error in the trial court's determination that plaintiff was entitled to half of defendant's share in the profits from the sale of Sawdon-Allison. The appreciation of defendant's ownership interest was not passive. Rather, it accumulated because of defendant's considerable efforts, which were facilitated by plaintiff's activities at home. Defendant's role as a partner in Sawdon-Allison was to oversee the management of buildings and properties owned by Sawdon-Allison, a responsibility defendant undertook in addition to the 40 or more hours per week he spent working at BTM. Defendant's Sawdon-Allison partnership agreement required him to "devote an appropriate and reasonably equal portion of [his] time and attention to the business of the partnership, so as to provide for the devotion of such time as is necessary for the successful operation of the business." Defendant's father testified that defendant was held to his agreement, and defendant worked enough to relieve defendant's father and a co-founder, Ed Sawdon, of substantial administrative responsibilities. Plaintiff's contributions in the marital home directly contributed to the maintenance and growth of defendant's ownership interest in the company. Without plaintiff having taken care of the children, the children's education, the housework, the laundry, the cooking, the banking, and the bill paying, while defendant worked

as both an employee of BTM and a 25% partner of Sawdon-Allison, defendant's role in Sawdon-Allison would not have been possible. Additionally, as the trial court noted, defendant's partnership agreement imposed an obligation to personally contribute to necessary loans or capital infusions for the benefit of Sawdon-Allison. Any such funding would have been pulled from the marital estate. The trial court did not clearly err in finding that plaintiff's contributions to the parties' household actively facilitated the appreciation in value of defendant's 25% interest in Sawdon-Allison. See *Hanaway*, 208 Mich App at 294. The appreciated value was therefore marital property subject to division.

For similar reasons, we also find that the trial court did not clearly err when it found that plaintiff was entitled to one-half of defendant's share in profits from the sale of his ownership interest in BTM. Defendant began receiving stock in BTM from his father, a part owner of BTM, several years after he began working for BTM and two years after he and plaintiff were married. He then received annual share transfers, one in every calendar year after 1988 with an additional transfer in 1995, increasing his ownership interest by a small amount each year. Although defendant characterized the transfers of stock as gifts, defendant's father testified that the transfers of stock were to intended to reduce his own tax liability, made on the advice of his tax attorney. Considering the circumstances surrounding the stock transfers, the trial court concluded that the stock constituted part of defendant's compensation, and was therefore considered marital property. The trial court was persuaded in its determination by the fact that although defendant continued to move up the chain of command at BTM, his salary stagnated over his final 10 years at the company. Apparently in lieu of a salary increase, defendant continued to receive gifts of BTM stock from his father, in addition to sizeable quarterly distributions as a part owner.

> The court finds that [the stock transfer] was not made for the purpose of planning for defendant's inheritance. This finding coupled with the fact that the defendant was a salaried employee of BTM Corporation and that his annual salary remained essentially stagnant for at least the last 10 years while his shareholder interest in the company continued to increase gives some support to the plaintiff's argument that the increase in the defendant's shareholder interest was a way for the company to increase the defendant's compensation[.]

After portions of the quarterly distributions were used to pay defendant's share of BTM's quarterly taxes, defendant deposited the surplus funds into the parties' joint savings account or the parties' joint investment portfolio. Funds placed in the "marital pot" were used for joint purposes, including construction of the marital home, subsequently paying off the mortgage, funding home improvements, and covering living expenses. The trial court concluded that defendant's ownership interest in BTM, as part of defendant's compensation, was an "asset acquired during the marriage" and was therefore marital property subject to division. The trial court's findings were supported by the record, and we are not definitely and firmly convinced that the trial court made a mistake in its determination.

Regardless, the trial court's determination that defendant's ownership interest in BTM constituted marital property was properly supported by evidence that defendant consistently treated that interest as marital property. The surplus funds from defendant's quarterly distributions were placed in the parties' "marital pot" and used for marital purposes. The

-6-

quarterly distributions were reported on the parties' joint marital tax return, and any tax liability for BTM or Sawdon-Allison was paid from marital funds. Over the years, the parties met with attorneys three separate times to discuss a family estate plan, and each time the parties included in their list of marital assets defendant's ownership interest in BTM. Before the divorce, the parties and their financial advisor had been brainstorming what to do with profits from the sale of defendant's interest in BTM and Sawdon-Allison so that plaintiff and defendant could retire together. Even if defendant's ownership interest in BTM could initially have been classified as separate property, it lost that distinction when the parties treated the asset as though it was a marital asset. *Cunningham*, 289 Mich App at 209. Additionally, as with profits generated through defendant's 25% interest in Sawdon-Allison, plaintiff actively contributed to the acquisition of defendant's compensation from BTM during the marriage. Any increase in the value of defendant's ownership in BTM was a result of "defendant's active efforts as a part owner and an employee of the company as well as [plaintiff's] efforts in facilitating [defendant's] ability to devote the necessary and expected time to [BTM.]" Any appreciation of the value of defendant's stocks during the marriage was therefore properly considered marital property and subject to division.

Affirmed.

/s/ Kathleen Jansen
/s/ William B. Murphy
/s/ Stephen L. Borrello