OLSON v OLSON

Docket Nos. 230588. 237244, 237288. Submitted March 18, 2003, at Detroit. Decided May 27, 2003, at 9:05 A.M. Leave to appeal sought.

Linda Olson obtained a judgment of divorce from John M. Olson, III, in the Wayne Circuit Court, Richard B. Halloran, Jr., J., which judgment essentially divided the parties' substantial marital estate equally but awarded the plaintiff stock in the defendant's closely held corporation, and further awarded the plaintiff spousal support and attorney fees. The defendant appealed, arguing that the trial court erred by failing to place a value on the defendant's corporation and instead awarding the plaintiff stock in the corporation (Docket No. 230588), erred by awarding the plaintiff spousal support in the amount of $50,000 a month, and erred by awarding the plaintiff $573,729 in additional attorney fees (Docket No. 273288). The defendant further argued that Chief Judge Pro Tem Cynthia Stephens of the circuit court erred by denying the defendant's motion to disqualify Judge Richard B. Halloran, Jr., from hearing the plaintiff's postjudgment motion regarding attorney fees (Docket No. 273244).

The Court of Appeals *held*:

1. Pursuant to the court rules and case law, the trial court abused its discretion under the circumstances of this case by failing to make a finding of fact regarding the value of the defendant's corporation, the value of which was intensely disputed by the parties, and instead ordering the parties to split the stock of the closely held corporation.

2. The trial court properly considered all the relevant factors and did not clearly err when it made its determination to award spousal support to the plaintiff because the facts showed she would not be able to support herself without invading assets awarded to her in the judgment of divorce. However, the trial court abused its discretion by failing to make a finding regarding the plaintiff's actual needs, and instead simply awarding the plaintiff one-half of the parties' pretax disposable income, or $50,000, a month.

3. Consistent with the trial court's ruling that the plaintiff was entitled to spousal support, the trial court did not abuse its discretion in awarding the plaintiff $573,729 in additional attorney fees

because the facts clearly showed that the plaintiff does not have the ability to bear the expense of the action without invading her assets, while the defendant does have the ability to pay. The fact that the plaintiff's attorneys failed to keep contemporaneous time records did not require the trial court to reduce or reject the plaintiff's claim for fees, particularly where the trial court conducted an evidentiary hearing on the issue of fees and considered the appropriate factors in determining the award.

4. The defendant's motion to disqualify the trial judge was properly denied because the defendant failed to show any actual bias or prejudice either against or in favor of the defendant or the plaintiff, or the parties' attorneys, or that the trial judge had an impermissible economic interest in the litigation.

Affirmed in part, reversed in part, and remanded for further proceedings.

O'CONNELL, P.J. dissenting in part, stated that he would affirm the trial court's decision to award the plaintiff one-half of the defendant's stock in his corporation because the parties do not dispute that the trial court equitably divided the marital estate by awarding each party fifty percent of the estate, and the stock division, although it may prove problematic, was not inequitable under the circumstances. The Court of Appeals should not substitute its judgment for that of the trial court.

DIVORCE — PROPERTY DIVISION — FACTUAL FINDINGS.

A trial court abuses its discretion when it fails to determine the value of a closely held corporation when the value is contested by the parties for purposes of property division.

*Henry Baskin, P.C.* (by *Henry Baskin*) and *Allan Falk, P.C.* (by *Allan Falk*), for the plaintiff.

*Butzel Long* (by *Edward D. Gold, John H. Dudley, Jr.,* and *Michael F. Smith*) for the defendant.

Before: O'CONNELL, P.J., and FITZGERALD and MURRAY, JJ.

FITZGERALD, J. In Docket No. 230588, defendant John M. Olson, III, appeals as of right and contests the manner in which the trial court divided certain property and the award of spousal support in this acrimonious and litigious divorce action. In Docket No.

237244, defendant appeals by leave granted the order entered by Wayne Circuit Judge Cynthia Stephens, acting as chief judge pro tem, denying his motion to disqualify Wayne Circuit Judge Richard B. Halloran, Jr., from entertaining postjudgment motions filed by attorney Henry Baskin on behalf of plaintiff Linda Olson. In Docket No. 237288, defendant appeals as of right the August 14, 2001, "Judgment and Award of Costs and Attorney Fees" by which Judge Halloran awarded plaintiff additional attorney fees and costs in the amount of $573,729.[1]

The parties were married in 1978 and have two children, only one of whom was a minor at the time this action was filed. The marital estate was substantial, including a 15,000 square-foot house in Grosse Pointe Farms and defendant's closely owned corporation, J. M. Olson Corporation ("the corporation"). Defendant owned the corporation before the marriage. Originally, the corporation built fast-food restaurants and convenience stores. In 1984, the corporation moved into commercial construction and developed a relationship with Ford Motor Company. The corporation, a Subchapter S corporation, now engages in general contracting and construction management. Defendant owns 71.85 percent of the stock and is the chairman of the corporation.[2]

During the marriage, the parties acquired substantial assets in addition to the corporation. The parties

---

[1] Earlier in the case, the trial court ordered defendant to pay $50,000 to plaintiff's counsel and to deposit an additional $150,000 in plaintiff's client trust account with her attorney.

[2] Defendant's two long-time business partners, Mark Millich and John Olszewski, who apparently are defendant's blood relatives, own the remaining 28.15 percent of the stock.

stipulated the values of other assets, including the marital home valued at $2.18 million, various automobiles, boats, investment and retirement accounts, life-insurance policies and annuities, and business interests. The total value of the other assets to which the parties stipulated (excluding the corporation and various other properties) was $5,948,519.

Following a twenty-one-day trial, the court made findings of fact and conclusions of law and entered a judgment of divorce on September 15, 2000. On August 14, 2001, a "Judgment and Award of Costs and Attorney Fees" was entered.

## I. PROPERTY DISTRIBUTION

Defendant does not dispute that the trial court properly awarded each of the parties approximately fifty percent of the marital estate. Defendant does argue, however, that the trial court erred by dividing defendant's interest in the stock of the corporation, rather than setting a value on defendant's interest in the stock and awarding plaintiff one-half of the value of the stock.[3]

This Court reviews a property distribution in a divorce case by first reviewing the trial court's factual findings for clear error, and then determining whether the dispositional ruling was fair and equitable in light of the facts. *Hanaway v Hanaway*, 208 Mich App 278, 292; 527 NW2d 792 (1995). In its findings of fact and conclusions of law, the trial court noted the discrepancies in the testimony of the parties' expert witnesses with regard to the proper method of valu-

---

[3] A stay was placed on the division of the stock pending this appeal.

ing the business, as well as the large discrepancy between the experts' valuations. The trial court then ruled with regard to the valuation of the business:

> At this time the court will not set it's [sic] own value on Defendant-Husband's interest in the John M. Olson Corporation. Instead, the court will award Plaintiff-Wife one-half of Defendant-husband's stock in the John M. Olson Corporation. This will not cause any problems in running the Corporation since she will be a minority shareholder. Defendant-Husband and the other shareholders will retain a 64.08% controlling interest in the Corporation.
>
> Further, since this will be an involuntary transfer on the part of Defendant-Husband the provisions in the Stock Redemption Agreement as Amended will not apply. If there are any impediments to this transfer, then as a Stockholder and the Controlling Stockholder of the Corporation, Defendant-Husband will cause the Stock Redemption Agreement as Amended to be further amended to carry out the ruling of this court and cause the transfer of one-half of his stock interest to the Plaintiff-Wife.
>
> If the Defendant-Husband enters into a purchase agreement with the Plaintiff-Wife's [sic] for her shares in the John M. Olson Corporation the actual involuntary transfer of the shares to the wife will not have to occur.

This provision was included in the September 15, 2000, judgment of divorce.

Defendant thereafter filed a motion for stay of the transfer of the stock. At the hearing on the motion, the trial court stated:

> The Court feels that it has the authority to award half the stock and that's what the Court did with the provision with the thought in the background that either Mr. Olson or Mrs. Olson might enter into negotiation to buy the stock back from her. Or to leave it in place.

The court ultimately granted the stay, noting:

> But since no one provided the Court with what the Court thought was a situation where we could make a sound basis. We thought maybe what will happen then is the parties will agree on a sale price and by [sic] Mrs. Olson out.
>
> Now, it appears to the Court that we're not going to do that. But instead we're going to the court of appeals. We're going to spend a year or two getting to the court of appeals, which if this Court is reversed, there [sic] going to say, "Court, you have to decide how much this is worth." So the Court comes back and by then who knows what it will be worth.
>
> And at that point, the Court will set a figure. And Mr. Olson will then pay that cash to Mrs. Olson. And two years down the road we'll be at the point where we could be today if, once again, the attorneys or the parties could just agree on how much to buy Mrs. Olson's share of the stock.

The trial court stayed its own stock-division order for nearly four months. The trial court thereafter dissolved the stay, and defendant sought emergency relief in this Court. This Court ordered the trial court to hold a hearing and issue a decision on the motion for stay. The trial court thereafter granted a stay.

In support of his argument that the trial court erred by failing to place a value on defendant's interest in the stock and instead ordering the division of the stock, defendant relies on *Kurtz v Kurtz*, 34 Mich App 34; 190 NW2d 689 (1971). In *Kurtz*, the trial court ordered a property division that included an equal division of the stock in Concrete Black & Products Company, a company that was solely owned by the plaintiff before the marriage. The division of property was made after extensive testimony and the submission of voluminous business records to the trial judge. This Court, noting that the plaintiff's contributions to the management of the company were great, and noting that the parties agreed that the order

resulted in a "totally impossible situation regarding the management of the company," held that "it is better to place a money value on the parties' respective interest in this company rather than to leave the division in the form of an award of shares of stock." *Id.* at 36.

The trial court distinguished *Kurtz* on the ground that the order in *Kurtz* gave each party fifty percent of the stock and, therefore, "forced the corporation to cease to exit [sic] because there was no majority to vote." However, there is no language in *Kurtz* suggesting that the court's ruling was based on the percentage of stock awarded to a party. Rather, the court focused on the "impossible situation regarding the management of the company." It appears that the "impossible" situation referred to arose from the facts that the plaintiff owned the company before the marriage, that the plaintiff had contributed to the management of the company, and that it was impossible for the parties to continue in a business relationship. Indeed, in *Schaffer v Schaffer*, 37 Mich App 711, 713; 195 NW2d 326 (1972), a case in which the trial court awarded the wife a substantial cash award in lieu of stock in a closely held family corporation, this Court stated:

> In *Kurtz v Kurtz*, 34 Mich App 34 [190 NW2d 689] (1971), this Court had ample opportunity to observe the myriad of problems that can arise in a divorce suit where the parties each owned stock in a close-knit family corporation after a judgment of divorce has been granted to the parties.
>
> Here the chancellor quite properly awarded all of the stock to the husband and compensated the wife by a substantial cash award, payable over a period of years. The record in the instant case discloses expert testimony presented by the plaintiff wife and defendant husband as to

the valuation of the stock in question. The court's assessment of value of the corporation was much higher than that of the defendant husband's expert and much lower than that of the plaintiff wife's expert. In *Young v Young*, 354 Mich 254, 257 [; 92 NW2d 328] (1958), Justice VOELKER, writing for the Court in a case similar to the instant one, stated:

"There is no mathematical formula in Michigan for the settlement of this vexing problem; rather it is wisely left to the broad discretion of the learned chancellor who has the benefit—and often dubious pleasure—of having the feuding parties wrangle in his presence. See, generally, *Johnson v Johnson*, 346 Mich 418 [; 78 NW2d 216] (1956). With his closer view of the entire situation he is ordinarily in a better position to make an equitable division than we."

Similarly, in *McDougal v McDougal*, 451 Mich 80, 91 n 9; 545 NW2d 357 (1996), although the case involved different factual circumstances (awarding the wife an interest in the defendant's patents), the Court noted, "it would be a rare divorcing couple who would benefit from a judgment that requires them to maintain an ongoing business relationship." In *Young v Young*, 354 Mich 254; 92 NW2d 328 (1958), the Court removed from one spouse shares in a family business that she owned before the divorce, and replaced the shares with stocks of comparable worth in order to prevent the ex-spouse's continued, harmful interference with management of the company.

In the present case, the testimony of the parties' experts spanned five days. Plaintiff's expert's valuation of the corporation was much higher than the valuation placed on the corporation by defendant's expert. Unlike *Schaffer*, however, the trial court in this case did not make a finding regarding the value of the corporation. Rather than select one of the expert's valuation figures, choose another figure, or

appoint its own expert, the court ordered that the stock be split unless the parties could come to a mutual agreement regarding the value. In essence, the trial court neglected its duty to make a finding of fact. Instead, the court admittedly came up with the stock division as a means of forcing the parties to agree on a value for defendant's ownership interest. Given the nature of the relationship between the parties, however, it is apparent that the parties will not be able to come to an agreement.

Moreover, it is settled law that trial courts are required by court rule to include a determination of the property rights of the parties in the judgment of divorce. MCR 3.211(B); *Yeo v Yeo,* 214 Mich App 598, 601; 543 NW2d 62 (1995). As a prelude to this property division, a trial court must first make specific findings regarding the value of the property being awarded in the judgment. *Beaty v Beaty,* 167 Mich App 553, 556; 423 NW2d 262 (1988). There are numerous ways in which a trial court can make such a valuation,[4] but the most important point is that the trial court is obligated to make such a valuation if the value is in dispute.[5] Accordingly, we have held that a trial court clearly errs when it fails to place a value

---

[4] See, e.g., *Young, supra* at 257 (valuation based on expert testimony), *Lee v Lee,* 191 Mich App 73, 75-76; 477 NW2d 429 (1991) (valuation based on lay testimony), *Sullivan v Sullivan,* 175 Mich App 508, 511; 438 NW2d 309 (1989) (valuation based on parties' testimony), or the trial court could appoint its own independent expert to provide it with a perhaps more objective valuation. MRE 706; *Steckley v Steckley,* 185 Mich App 19, 23-24; 460 NW2d 25 (1990).

[5] The actual value may not always be in dispute. A court could, for example, order the sale of a marital home (if that is an option in the case) without determining its value and splitting whatever equity exists in the house between the parties. In this case, however, selling the corporation was not possible, thus necessitating the valuation.

on a disputed piece of marital property. *Steckley v Steckley*, 185 Mich App 19, 23-24; 460 NW2d 255 (1990) (the trial court clearly erred in failing to determine value of the plaintiff's interest in McDonald's franchises); *McNamara v McNamara*, 178 Mich App 382, 393; 443 NW2d 511 (1989) (the trial court abused its discretion in failing to place value on law practice); *Kowalesky v Kowalesky*, 148 Mich App 151, 157; 384 NW2d 112 (1986) (the trial court clearly erred in failing to place value on accounts receivable of dental practice). Hence, it was not enough in this case to simply conclude that because neither party submitted persuasive evidence regarding the value, the parties should be left to settle the value after the judgment and findings were entered. Settlement negotiations had presumably failed, which necessitated the trial in the first place. Once trial commenced, the trial court's duty to determine a value was triggered, and the parties did not have a continuing obligation to settle the issue.

Further, the trial court's conclusion that *Kurtz* is inapplicable because defendant and his fellow stockholders will still retain a 64.08 percent controlling interest in the company assumes that the other shareholders holding 28.15 percent will combine with defendant to form a majority. However, it cannot be assumed that the fellow shareholders will necessarily join with defendant, particularly since their votes are presumably now more powerful because no one holds a majority of the stock. At trial it was clearly established that the success of this corporation is dependent on defendant and his business connections, particularly with Ford Motor Company.

For these reasons, and considering *Kurtz*, we con-
clude that the trial court abused its discretion under
the circumstances of this case by failing to make a
finding regarding the value of the corporation and
instead ordering the parties to split the stock of
defendant's closely held corporation. We therefore
vacate the provision in the judgment of divorce that
orders a division of the stock and remand this matter
to the trial court[6] to make a finding regarding the
value of the stock and to grant plaintiff a cash award
in an amount equal to one-half of the value of defen-
dant's stock interest in the corporation.[7]

## II. SPOUSAL SUPPORT

Defendant argues that the trial court's award of
spousal support in the amount of $50,000 a month
was inequitable and was based on improperly admit-
ted evidence and erroneous factual findings. The trial
court's factual findings are reviewed for clear error.
*Moore v Moore*, 242 Mich App 652, 654; 619 NW2d 723
(2000). The findings are presumptively correct, and
the burden is on the appellant to show clear error. A
finding is clearly erroneous if the appellate court, on
all the evidence, is left with a definite and firm con-
viction that a mistake has been made. *Id.* at 654-655.
If the trial court's findings are not clearly erroneous,
this Court must then decide whether the dispositional

---

[6] In an Order of Reassignment dated January 2, 2003, Wayne Circuit
Court Chief Judges Timothy M. Kenny and Mary Beth Kelly ordered that
this case be reassigned effective January 2, 2003, from Judge Halloran to
Judge Maria Oxholm. Therefore, Judge Oxholm will conduct any proceed-
ings on remand.

[7] It is up to the trial court to determine the period over which the cash
award will be payable.

ruling was fair and equitable in light of the facts. *Sparks v Sparks*, 440 Mich 141, 151-152; 485 NW2d 893 (1992). The trial court's decision regarding alimony must be affirmed unless the appellate court is firmly convinced that it was inequitable. *Sparks*, *supra*.

The judgment of divorce provided with regard to spousal support:

> Commencing August 17, 2000, the Defendant shall pay Plaintiff spousal support of Fifty Thousand $50,000 Dollars per month until the property award provided for in this Judgment of Divorce has been paid in full and is producing comparable income for the Plaintiff or until the Plaintiff's death or until further order of the court. The spousal support shall be taxable to Plaintiff and deductible by Defendant.

In its findings of fact with regard to the judgment of divorce, the court, after summarizing the evidence presented, found that "it is unable to fully rely on either the Plaintiff-Wife's budget or the Defendant-Husband's testimony." The court noted, however, "it is clear from testimony that the Defendant-Husband, the sole provider for the family, earns One Million Dollars ($1,000,000) per year in salary and in 1998 earned upwards of Two Million Dollars ($2,000,000) including his salary. This would give the parties a disposable income of about One Million Dollars ($1,000,000) after taxes or Five Hundred Thousand Dollars ($500,000) each." The court then concluded, "It is this Court's finding based on this income and coordinating it with Plaintiff-Wife's budget, that she needs pre-tax income of about $650,000 ($650,000) per year to equal her current spendable income." Thus, in its conclusions of law, the court concluded, in relevant part:

This Court has determined that Plaintiff-Wife shall receive a substantial sum of cash and stock as her share of the marital estate and she will eventually be able to generate income from her investments. It is therefore, the order of this Court, that to assure Plaintiff-Wife interim income consistent with her needs, that commencing upon issuance of this opinion, the Defendant-Husband shall pay Plaintiff-Wife spousal support of $50,000 per month until the property award has been paid in full and is producing sufficient comparable income for the Plaintiff-Wife or until the Plaintiff-Wife's death.

The award of alimony is in the trial court's discretion. *Pelton v Pelton*, 167 Mich App 22, 27; 421 NW2d 560 (1988). The main objective of alimony is to balance the incomes and needs of the parties in a way that will not impoverish either party, and alimony is to be based on what is just and reasonable under the circumstances of the case. *Moore, supra* at 654. Among the factors that should be considered are: (1) the past relations and conduct of the parties, (2) the length of the marriage, (3) the abilities of the parties to work, (4) the source and amount of property awarded to the parties, (5) the parties' ages, (6) the abilities of the parties to pay alimony, (7) the present situation of the parties, (8) the needs of the parties, (9) the parties' health, (10) the prior standard of living of the parties and whether either is responsible for the support of others, (11) contributions of the parties to the joint estate, (12) a party's fault in causing the divorce, (13) the effect of cohabitation on a party's financial status, and (14) general principles of equity. *Ianitelli v Ianitelli*, 199 Mich App 641, 644; 502 NW2d 691 (1993); *Thames v Thames*, 191 Mich App 299, 308; 477 NW2d 496 (1991).

Defendant first argues that plaintiff was awarded a sizable portion of the marital estate and that the property award is sufficient for her suitable support and maintenance, thus barring spousal support. Defendant acknowledges that a party should not have to invade property for support, but relies on *Schaffer, supra*, for the proposition that a substantial property award bars spousal support as a matter of law. In *Schaffer*, the trial court ordered the husband to buy out the wife's one-half interest in the family-owned business, but compensated her with a "substantial" cash award payable over a number of years. The husband was also ordered to assume a large indebtedness. This Court affirmed the denial of alimony in light of the substantial property award.

The facts in *Schaffer* are distinguishable in that the wife in *Schaffer* received a large cash award. In the present case, the property award to plaintiff includes mostly nonincome-producing assets. Other than stock in the company, plaintiff's income-producing assets amount to $370,118.31 in cash and securities[8] and $51,353.17 in annuities.

Here, the parties have clearly led an affluent lifestyle during their twenty-two-year marriage, and defendant's income and earning potential are substantial, while plaintiff's is essentially nonexistent. Evidence was presented that defendant is in good health, while the plaintiff suffered from ovarian cancer that is now in remission. In *Hanaway, supra* at 295-296, in reversing a denial of alimony by the trial court, this Court stated:

---

[8] The $370,118.31 is in two IRA's and, therefore, whatever earnings these funds generate are not available to plaintiff to defray current living expenses.

Plaintiff's information concerning monthly expenses and maintenance requirements, submitted after trial, established that she could not maintain herself exclusively on her monthly income, which was considerably less than defendant's, on which the parties had formerly maintained an affluent lifestyle. Even without this evidence, we believe plaintiff presented a strong case for alimony given the length of the marriage, the parties' lifestyle during the marriage, plaintiff's $27,000 income and defendant's $371,000 income. With regard to the trial court's determination that plaintiff's income, augmented by cash and other assets worth over $560,000, enabled her to maintain a reasonable standard of living without defendant's assistance, we believe the court put too much weight on the value of the property awarded to plaintiff. In a situation such as this, where both parties are awarded substantial assets, the court, in evaluating a claim for alimony, should focus on the income-earning potential of the assets and should not evaluate a party's ability to provide self-support by including in the amount available for support the value of the assets themselves. Given the length of the marriage, the magnitude of the marital estate, and defendant's capital position and earning potential after the divorce, plaintiff should not be expected to consume her capital to support herself.

In the present case, although both parties received substantial assets in the property settlement, only a small fraction of plaintiff's award is liquid or capable of income generation. As in *Hanaway*, given the parties' lifestyle, defendant's income potential, the length of the marriage, and the magnitude of the marital estate, it would be inequitable to require plaintiff to "consume her capital to support herself." However, it appears that the trial court rejected the budgetary evidence submitted by the parties and, instead of determining plaintiff's needs, simply awarded plaintiff the equivalent of fifty percent of the pretax disposable

income generated by defendant in 1998. The trial court abused its discretion by failing to make a finding regarding plaintiff's needs and by simply awarding plaintiff one-half of the parties' pretax disposable income.

On remand, the trial court must revisit the issue of alimony in light of the fact that plaintiff is to be awarded one-half of the value of the stock of the corporation. The trial court is encouraged to consider the above factors in determining whether to award spousal support and, if so, in determining an appropriate award of spousal support.

### III. ATTORNEY FEES AND COSTS

Defendant argues that the trial court abused its discretion by ordering defendant to pay an additional sum of $573,729,[9] representing expert fees in the amount of $154,463.16, basic attorney fees in the amount of $363,950, and "value-added" attorney fees in the amount of $112,824, for a total of nearly $800,000.[10] The trial court's ruling on a motion for attorney fees is reviewed for an abuse of discretion. *Kosch v Kosch*, 233 Mich App 346, 354; 592 NW2d 434 (1999).

In its judgment and award of costs and fees, Judge Halloran stated, "After trial in the original divorce action this Court found that the Plaintiff did not have

---

[9] Defendant had already paid $200,000 to plaintiff's attorney as ordered by the trial court at the onset of litigation.

[10] We reject defendant's argument that fees and costs were improperly awarded because the petition for fees had to be filed in plaintiff's name. The petition by plaintiff's counsel, which was submitted pursuant to the trial court's ruling providing for those fees, was correctly understood by the trial court as being filed on behalf of plaintiff.

the ability to bear the expense of this action and that the Defendant does have the ability to pay. This Court now finds that Plaintiff's fees and costs are reasonable." The "finding" to which the court was referring was the conclusion in the "Findings of Fact and Conclusion of Law" entered on August 17, 2000, after the conclusion of the divorce trial.

A three-day evidentiary hearing was held with regard to attorney and expert fees and costs in January 2001. In the judgment resulting from that hearing, Judge Halloran relied on his earlier conclusion that plaintiff was unable to bear the expense of the litigation and did not readdress the issue. Judge Halloran then awarded plaintiff additional attorney and expert fees and costs in the amount of $573,729 in accordance with the documentation and testimony submitted by plaintiff.

A trial court may order one party to a divorce to pay the other party's reasonable attorney fees and litigation costs if the record supports a finding that financial assistance is necessary because the other party is unable to bear the expense of the action. *Maake v Maake*, 200 Mich App 184, 189; 503 NW2d 664 (1993). The reason for the rule is that no party should have to invade the assets the party relies on for support in order to obtain representation. *Id.* Here, defendant contends that plaintiff is able to bear the expense of the litigation because of the substantial property award that plaintiff received. However, as noted above, the assets plaintiff received are generally not liquid assets, and the alimony that plaintiff receives was awarded to cover the costs of living. The trial court's factual finding that plaintiff is unable

to bear the expense of the litigation is supported by the record and is not clearly erroneous.

Defendant also contends that plaintiff's counsels' failure to keep contemporaneous time records required the trial court to reject or reduce the claim for fees as a matter of law. We disagree. Defendant cites no authority to support a finding that contemporaneous time records are required to be kept. Indeed, in *Howard v Canteen Corp*, 192 Mich App 427, 437-438; 481 NW2d 718 (1991), overruled on other grounds by *Rafferty v Markovitz*, 461 Mich 265; 602 NW2d 367 (1999), the Court stated that:

> The most useful starting point for determining the amount of a reasonable attorney fee is the number of hours reasonably expended on the case multiplied by a reasonable hourly rate. The party seeking the fee bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates . . . . While such [contemporaneous billing] records are not required to be kept, in demanding a large sum of attorney fees the lack of contemporaneous time records leaves room for doubt regarding the reasonableness of the hours expended. Where the opposing party challenges the reasonableness of the requested fee, the trial court should hold an evidentiary hearing regarding the issue. If any of the underlying facts, such as the number of hours spent in preparation, are in dispute, the trial court should make findings of fact regarding the disputed issues.

Here, the trial court conducted an evidentiary hearing on the issue of attorney fees and expert-witness fees and costs. *Head v Phillips Camper Sales & Rental, Inc*, 234 Mich App 94, 113; 593 NW2d 595 (1999). Detailed testimony was presented regarding fees and costs. Although there is no precise formula for assessing the reasonableness of an attorney fee,

the trial court considered such relevant factors as the skill, time, and labor involved, the fee customarily charged in the locality for similar services in "high end" divorce actions, the likelihood that plaintiff's counsel's time commitment to this case precluded other employment, the amount in question and the results achieved, the expense incurred, the professional standing and experience of the attorney, and the retainer agreement. See, e.g., *In re Condemnation of Private Property for Highway Purposes*, 209 Mich App 336, 341-342; 530 NW2d 183 (1995). The trial court found that plaintiff's counsel expended 1,255 hours of attorney time on the case, that attorney Baskin's base fee was fixed by his retainer in a reasonable hourly amount, that the base hourly fee for other attorneys was reasonable, and that the base fee should be enhanced pursuant to the "value added" clause of the retainer agreement.[11] Similarly, the trial court accepted testimony regarding the issue of expert-witness fees and costs. The evidence presented supports the trial court's detailed factual findings, and we find no error in the trial court's determination regarding the reasonableness of the fees and costs.

IV. DISQUALIFICATION OF THE TRIAL JUDGE.

Defendant contends that he was denied an impartial arbiter with regard to plaintiff's motion for fees and costs by the denial of his motion to disqualify Judge Halloran from deciding plaintiff's motion. In

---

[11] Defendant's own expert and attorneys for both parties established that a value enhancement clause is a common and necessary feature of retainer contracts in "high end" divorce actions.

reviewing a motion to disqualify a judge, this Court reviews the trial court's findings of fact for an abuse of discretion and the court's application of those facts to the relevant law de novo. *Cain v Dep't of Corrections*, 451 Mich 470, 503; 548 NW2d 210 (1996).

Plaintiff filed a motion for attorney and expert fees and costs after the judgment of divorce was entered. Judge Halloran conducted hearings over the course of three days in January 2001. On July 26, 2001, Judge Halloran was detained by the Wayne County Sheriff's Department in a men's restroom at Detroit Metropolitan Airport for allegedly engaging in a lewd and indecent act. On July 30, 2001, it was announced that Judge Halloran would be taking a thirty-day paid leave of absence, and that Chief Judge Sapala would review the matter. It appears that on August 7, 2001, the prosecuting attorney's office announced that charges would not be filed against Judge Halloran. The fee judgment was entered on August 14, 2001.

Plaintiff's counsel, Henry Baskin, is a member of the Judicial Tenure Commission. On August 28, 2001, defendant filed a motion asking Judge Halloran to disqualify himself retroactive to July 26, 2001, and to vacate as void the fee judgment and to reassign the case to another judge because of the allegations of misconduct and the potential Judicial Tenure Commission investigation in which Baskin would be involved. Defendant moved for disqualification on the grounds of actual bias or prejudice for Baskin under MCR 2.003(B)(1), a knowing economic interest that could be substantially affected by the proceeding under MCR 2.003(B)(5), and the denial of defendant's due-process right to an impartial arbiter.

Judge Halloran denied the motion to vacate and to disqualify on the ground that plaintiff offered no evidence of bias in fact or partiality against or for either party or attorney. Judge Halloran further noted that there were a number of issues that were decided in defendant's favor. Judge Halloran also ruled that the motion was untimely because the alleged basis for the source of bias took place on July 26, 2001, yet defendant did not file the motion until August 28, 2001, after receiving an adverse decision.

The parties eventually appeared before Chief Judge Sapala on September 25, 2001. Judge Sapala disqualified himself from deciding the motion on the basis that he was "too involved with this Judge and how we proceed with him because of my duties as Chief Judge." The following day, the parties appeared for a hearing on the motion before Chief Judge Pro Tem Stephens. In denying the motion to disqualify, Judge Stephens stated her reasons at length:

> The Court does not find in this particular case that the issue of when the matter was discovered is dispositive. It is interesting, but not dispositive.
>
> It is clear from this case that everyone knew from the beginning of the case that Mr. Baskin was on the tenure commission. It is obvious that the tenure commission from the outset of this case has jurisdiction over each and every person servicing in judicial or quasi-judicial office within the judicial branch of government. The fact that there was an incident that occurred in July that was reported anonymously on the electronic media shortly thereafter and naming the judicial officer subsequently in the print media is not significant enough for this Court to use it as a factor in deciding this motion.

\*     \*     \*

The Court's review of the pleadings and papers filed in this case and presented to me do not indicate that there were any statements made or alleged of actual bias by the trial judge against or for either the attorneys or the parties.

The next question, is there a formal complaint—is there a complaint or matter pending before the Judicial Tenure Commission?

\*     \*     \*

It is only in the most unusual cases that a period of time between July 26th and even August 28th, much less August 14th would have been a period of time in which there was, in fact, a complaint formally filed before the Judicial Tenure Commission of which a tenure commissioner was likely to be aware. Perhaps there are circumstances that the Court can imagine that would move more rapidly, i.e., if an individual on July 26th killed somebody, but that is pretty unusual. The reality is that every judge each and every day that she serves in judicial office is subject to a request for investigation and/or complaint by litigants, people walking about the community, lawyers, or any human being who believes that the Judge has failed to live up to her or his responsibilities under the constitution and canons. The mere fact that this was a highly publicized incident does not raise this conduct to any higher level than any other allegedly inappropriate or canon violating conduct.

\*     \*     \*

It is asserted here that there's a financial relationship, or implicit financial relationship between the trial judge and the—and Counsel for the plaintiff respondent herein. While it is true that the Judicial Tenure Commission can make a recommendation regarding a judge's livelihood, including whether or not a judge may ever sit as a judge again, it is the Supreme Court who makes the determination as to whether or not the Judge has been—will be suspended, the period of time of that suspension, whether or not a judge may sit or be removed, certainly upon recommendation by

the Tenure Commission. The fact that this is a potential out-
come does not create a sufficient financial link for this
court to find that it would be appropriate to remove this
trial court judge . . . .

\*     \*     \*

One has to presume that the People of the State of Michi-
gan knew what they were doing when they adopted the
1964 [sic] constitution and afforded us, and subsequent stat-
utes that afford us the opportunity to have a discipline com-
mission for judges that is comprised of both members of
the public, lawyers, and practicing lawyers, who by virtue
of their practice must practice before the individual which
they may have occasion to have matters pending against.
This is a situation in which the Court finds that the asser-
tions by the defendants are genuine, but this Court does not
believe that by a preponderance of the evidence or other-
wise that it has been presented to this court that there is
either a high probability of prejudice or bias which affected
the August 14th decision or that there is an actual showing
of bias or that the petitioner respondent has been deprived
of his fundamental constitutional right of a fair and impar-
tial tribunal. This is not a situation similar to that of the, I
want to say Cramden case, where the – where there was an
actual relationship and an actual investigation that occurred
and where the adjudicator was also the investigator. As of
this date, there is no issue that is joined that is a formal
complaint before the tenure commission for which we can
find the similarity.

An order was entered the same day denying the
motion "for reasons stated on the record."

On appeal, defendant argues that Judge Halloran
had not entered the fee judgment at the time of his
detention and the circumstances require that he be
disqualified to preserve defendant's fundamental
rights of due process and right to a fair trial. Defen-
dant also contends that disqualification is required
under MCR 2.003(B)(5) because of the personal

issues at stake, including Judge Halloran's reputation, career, and economic livelihood, all of which could become issues subject to investigation by the Judicial Tenure Commission. Defendant also moved under MCR 2.003(B)(1), alleging obvious personal bias and prejudice in favor of Mr. Baskin on the part of Judge Halloran.

MCR 2.003(B)(1) and (5) provide that a judge is disqualified when the judge cannot impartially hear a case, including but not limited to circumstances in which the judge is personally biased or prejudiced for or against a party or attorney, or where the judge knows he has an economic interest in the subject matter of the controversy "or has any other more than de minimis interest that could be substantially affected by the proceeding." In addition, where the requirement of showing actual bias or prejudice under MCR 2.003(B)(1) has not been met, a party may pursue disqualification pursuant to the Due Process Clause, which requires an unbiased and impartial decision maker. *Cain, supra* at 497. In *Cain*, the Supreme Court noted that the United States Supreme Court has identified situations "where 'experience teaches that the probability of actual bias on the part of the judge or decision maker is too high to be constitutionally tolerable,' " and disqualification is warranted without a demonstration of actual bias. *Id.* at 498, quoting *Crampton v Dep't of State*, 395 Mich 347, 351; 235 NW2d 352 (1975). One of these situations is where the judge or decision maker is " 'enmeshed in [other] matters involving [the moving party].' " *Id.*, quoting *Crampton, supra* at 351. However, the *Cain* Court cautioned that disqualification on this basis is only required "in the most extreme cases." *Id.*

No evidence was presented that Judge Halloran had a financial interest in the divorce litigation before him or in the decision whether to award attorney fees to plaintiff. Defendant's proposition that Judge Halloran's career as a judge was at stake, thus implicating his future judicial salary, is too tenuous to be considered a valid ground for disqualification under MCR 2.003(B)(5). Additionally, the mere fact that plaintiff's counsel is a member of the Judicial Tenure Commission, and evidence that the fee judgment was still unfinished at the time of Judge Halloran's detention,[12] does not establish that Judge Halloran was biased in favor of plaintiff or that defendant was denied a neutral arbiter. Defendant failed to present any evidence to support a finding that Judge Halloran was biased in favor of plaintiff or to support a finding that there was a high probability of bias on the part of Judge Halloran.

Affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion. Jurisdiction is not retained.

MURRAY, J., concurred.

O'CONNELL, P.J. (*dissenting in part*). I respectfully dissent. In this contentious divorce, plaintiff and defendant do not dispute that the trial court properly awarded each party approximately fifty percent of the martial estate. Defendant's main contention on appeal is the manner in which the assets were divided. Because the trial court equitably divided the marital

---

[12] Judge Stephens found that the fee judgment was not entered on July 13, 2001, the date handwritten on its back page, but rather on August 14, 2001, after Judge Halloran's detention.

estate by awarding each party fifty percent, I would affirm the decision of the trial court.

This Court reviews a property distribution in a divorce case by first reviewing the trial court's factual findings for clear error and then determining whether the dispositional ruling was fair and equitable in light of the facts. *Hanaway v Hanaway*, 208 Mich App 278, 292; 527 NW2d 792 (1995). My review of the lower court record reveals no clear error on the part of the trial court. In fact, my review of the parties' briefs does not reveal any disputes concerning the trial court's factual findings.[1] In fact, the parties appear to agree that the trial court made certain factual findings as required by law and then awarded each side approximately fifty percent of the marital estate.

This appeal concerns "whether the dispositional ruling was fair and equitable in light of the facts." See *id.* While I agree with the majority opinion that the division of stock has the potential to cause a controversial, ongoing problem, I cannot conclude that this division was inequitable.[2] Nor can I reach the conclu-

---

[1] I note that defendant complains that the trial court failed to set a value on the stock. However, I know of no case law that requires the trial court to set a value on the stock, if it divides the stock in an equitable manner.

[2] I find it a bit unusual that it is defendant who claims that the stock division is unworkable. Plaintiff, on the other hand, argues that it is a fair and equitable division of the marital assets. In my opinion, the trial court is in a better position to make an equitable division of the property. As the majority notes, *ante* at 626, our Supreme Court in *Young v Young*, 354 Mich 254, 257; 92 NW2d 328 (1958), held:

There is no mathematical formula in Michigan for the settlement of this vexing problem; rather it is wisely left to the broad discretion of the learned chancellor who has the benefit—and often dubious pleasure—of having the feuding parties wrangle in his presence. See, generally, *Johnson v Johnson*, 346 Mich 418 [; 78 NW2d

sion that the trial court's division of assets creates an unworkable situation. If I had been the trial court judge, I cannot say that I would have divided the estate in the manner and form that it was divided. Indeed, as the majority suggests, I would have placed a value on the stock and awarded plaintiff one-half of it. However, it is not within an appellate court's authority to substitute its judgment for that of the trial court. See *Moore v Moore*, 242 Mich App 652, 654-655; 619 NW2d 723 (2000).

The dispositional ruling was fair and equitable in light of the facts of this case. See *Hanaway, supra.* Impressing personal views on the trial court does not comport with the appellate court's role in the judicial system. See *Moore, supra.* Thus, I would affirm the decision of the trial court.

---

216] (1956). With his closer view of the entire situation he is ordinarily in a better position to make an equitable division than we.