*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

---

ANIKA MARIE ATKINSON,

        Plaintiff/Counterdefendant-Appellee,

v

MAURICE WAYNE ATKINSON II,

        Defendant/Counterplaintiff-Appellant.

UNPUBLISHED
January 27, 2022

No. 357446
Ingham Circuit Court
Family Division
LC No. 20-001549-DM

---

Before: CAMERON, P.J., and M. J. KELLY and SHAPIRO, JJ.

PER CURIAM.

Defendant, Maurice Wayne Atkinson II, appeals as of right the judgment of divorce dissolving his marriage to plaintiff, Anika Marie Atkinson, and granting her sole legal and physical custody of their minor child, HA. For the reasons stated in this opinion, we affirm.

## I. BASIC FACTS

The parties married in May 2017. HA was born approximately one year later. HA is Anika's only child; however, Maurice has joint custody of four children from a prior marriage, with parenting-time occurring on a week-on/week-off schedule. During their marriage, Maurice and Anika assumed traditional roles, with Maurice working and Anika focusing on taking care of the household and providing care for HA and for Maurice's other children on weeks when he had custody of them.

According to Maurice, the marriage began to breakdown in January 2020 after Anika had an abortion even though he wanted her to carry the pregnancy to term. He stated that after the abortion, he thought "Eff this" and began to have extramarital affairs. Additionally, Maurice testified that Anika had a "proclivity for violence," and recounted that she punched him in the head several times after he finally told her that he was having affairs. He testified that, if HA had not been present, he "woulda knocked the slam out of her." Maurice added that if he had hit Anika, he would have been better at hurting her than she was at hurting him.

-1-

In contrast, Anika described several incidents in which Maurice perpetrated domestic violence against her. First, on New Year's Eve in 2016, Maurice was leaving the house right before midnight, and Anika grabbed his arm and told him to wait until later. She testified:

> And he flipped my arm off of him and grabbed me by my shoulders and slammed me against the wall in our bathroom . . . and said to "Keep my fucking hands to myself." And I pushed him off of me and said, "Don't touch me like that. Don't grab me like that." And he said that—his comment was, "That's the problem with you women. You do something, and then when we react, now we're the problem."

The next incident was in August 2017. Maurice "was playing Magic and came home and was mad." He punched a wall, and Anika "made a comment about it like, 'Does that make you feel good?' " "And he told me to shut up and that if I kept talking that he was gonna beat my ass." Maurice then shoved her from behind, and Anika fell down and hit her head on the floor.

Another incident occurred the following March. Anika was pregnant with HA, they got into an argument about what to name her, and Maurice flipped the living room couch toward Anika. In August 2018, Maurice and Anika were having an argument about the frequency with which Maurice was not home. During the argument, Maurice threw a bench at the wall, putting a hole in it. Anika heard HA begin to cry in the other room and went to comfort her, but Maurice blocked the door so that she could not leave the bedroom. Anika threatened to call the police, and Maurice encouraged her to do so. Anika testified that Maurice then said, "[T]he next time I go to jail, it's gonna be worth it. We're both gonna leave today. I'll leave in handcuffs, and you can leave in a body bag." Maurice retrieved HA, put her on the bathroom floor, and allowed her to continue crying on the bathroom floor. Maurice then threatened to kill Anika if she did not "shut up." Another incident occurred in September 2019. HA was throwing her food on the floor and Maurice slapped HA's hand. Anika then yelled at Maurice and called him an "asshole." Maurice tackled Anika over the side of the couch and told her to "shut up." Anika screamed out, and HA said, "Momma." Maurice made Anika go down to the basement, and Anika attempted to use her smart watch to call 911. Maurice knocked Anika down, pulled off her watch, and swung her laptop at her, striking her arm. Anika called a friend for help, and they took pictures of the bruises on her arm.[1]

The final act of domestic violence between the parties was the incident on July 12, 2020. When Maurice admitted to having had multiple affairs, Anika punched Maurice several times, and Maurice threatened to kill Anika. Following that incident, Anika obtained a personal protection order (PPO) against Maurice.

---

[1] Maurice testified that the bruises in the photograph were likely from Anika holding a shopping bag on her wrist, and he claimed that she bruised very easily. He stated that whenever Anika showed him a bruise he directed her to "annotate it" because he did not want her to lie and say it was him that caused it. Neither the referee nor the judge at the de novo hearing found his testimony credible.

Anika filed a complaint for divorce on July 31, 2020. She requested sole legal and physical custody of HA. In response, Maurice filed a counterclaim for divorce, and he requested joint legal and physical custody with a week-on/week-off parenting-time schedule. On August 25, 2020, the trial court entered a temporary order granting the parties joint legal custody, and granting Anika sole physical custody. Thereafter, a hearing was held before a referee. The referee recommended that Anika receive sole legal and physical custody, with Maurice receiving parenting time on alternating weekends and Wednesday evenings. Maurice filed objections to the recommendation and requested a de novo hearing on the custody matter. Following the de novo hearing, the trial court found that Anika's testimony was credible, but did not find Maurice to be credible. The court determined that an established custodial environment existed solely with Anika. Thereafter, the court found that the best-interest factors in MCL 722.23 favored Anika receiving sole physical custody of HA, and that sole legal custody was proper under MCL 722.26a. In reaching a parent-time decision, the court made findings under MCL 722.27a.

Additionally, a bench trial was held to determine non-custody matters related to the divorce. As relevant to this appeal, the trial court valued certain personal property in the marital home at $5,000 and awarded Anika $17,000 in attorney fees. The court also determined that Maurice's income for purposes of calculating child support was $180,531.96. This appeal follows.

## II. CUSTODY AND PARENTING TIME

### A. STANDARDS OF REVIEW

MCL 722.28 provides that when reviewing a lower court order in a custody dispute, "all orders and judgments of the circuit court shall be affirmed on appeal unless the trial judge made findings of fact against the great weight of evidence or committed a palpable abuse of discretion or a clear legal error on a major issue." This statute "distinguishes among three types of findings and assigns standards of review to each." *Dailey v Kloenhamer*, 291 Mich App 660, 664; 811 NW2d 501 (2011) (quotation marks and citation omitted). Factual findings "are reviewed under the 'great weight of the evidence' standard." *Id*. "A finding of fact is against the great weight of the evidence if the evidence clearly preponderates in the opposite direction." *Pennington v Pennington*, 329 Mich App 562, 570; 944 NW2d 131 (2019). "Questions of law are reviewed for clear legal error. A trial court commits clear legal error when it incorrectly chooses, interprets, or applies the law." *Id*. (quotation marks and citation omitted). "Discretionary rulings, such as to whom custody is awarded, are reviewed for an abuse of discretion. An abuse of discretion exists when the trial court's decision is palpably and grossly violative of fact and logic. . . ." *Dailey*, 291 Mich App at 664-665 (quotation marks and citations omitted). "This Court gives deference to the trial court's factual judgments and special deference to the trial court's credibility assessments." *Brown v Brown*, 332 Mich App 1, 9; 955 NW2d 515 (2020).

### B. ANALYSIS

#### 1. ESTABLISHED CUSTODIAL ENVIRONMENT

Maurice argues that the trial court erred by finding that there was an established custodial environment only with Anika. "When resolving important decisions that affect the welfare of the

child, the court must first consider whether the proposed change would modify the established custodial environment." *Pierron v Pierron*, 486 Mich 81, 85; 782 NW2d 480 (2010).

> The custodial environment of a child is established if over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort. The age of the child, the physical environment, and the inclination of the custodian and the child as to permanency of the relationship shall also be considered. [MCL 722.27(1)(c).]

The trial court found that the established custodial environment existed solely with Anika because Maurice "did/does not provide care, security, stability, and permanence for [HA] in the same capacity that [Anika] did/does." However, whether an established custodial environment exists with one party should not be determined in relation to the environment that the minor child has established with the other party because there can be an established environment with both parties. See *Ritterhaus v Ritterhaus*, 273 Mich App 462, 471; 730 NW2d 262 (2007) ("[A] custodial environment can be established in more than one home.").

The court also found that Maurice did not provide a significant amount of care during the first six months of HA's life "and beyond" and that he usually did not attend HA's doctor's appointments. The record supports this finding. Maurice testified that during the first six months of HA's life, he would feed her, change her diaper, play with her, hold her on his chest, and sing to her. He did not bathe her until after she was six months old, and, although he provided money to purchase items necessary for HA's care, he testified that he would generally not physically purchase those items. Moreover, he also testified that HA had a babysitter. He recounted that sometimes when Anika left HA with him at their house, the babysitter would be present to care for HA. However, the trial court did not find Maurice's testimony credible.

Anika testified that the typical routine occurred as follows:

> On a typical day, [HA] wakes up around 6:30, 7:00 o'clock. It was my job to do breakfast, so if she came in, she would come to my side of the bed. This was her being out of the crib, so she could walk in and out of her room. I would go downstairs, make everybody breakfast. If all the children were there, everybody got fed. I made Maurice's breakfast.

> Once breakfast was done, everybody got vitamins. Once we were done with that, typically I would take [HA] upstairs. We would brush teeth, brush hair, get dressed. By that time, it's probably almost 8:30, 9:00 o'clock. She would get to play for a couple hours. I always did lunch around 11:30.

HA would play with Anika or Maurice's other children; however, Maurice was typically in his office if he was at home or was at work if he was not at home. Anika continued, explaining that lunch was at 11:30 so that it would coincide with when Maurice's other children had lunch when they were at daycare. After lunch, HA would take a nap for approximately two hours. "[A]round 2:00, 2:30, she would wake up, have a snack—sit in her high chair and get some sort of snack." They would then go pick the older children up from school or daycare, play when they got back to the house, and then have dinner. Anika stated that Maurice would only sometimes come to dinner,

-4-

and there were multiple times when she would bring him his plate in his office. After dinner, Anika would clear up and prepare leftovers for Maurice and his children to eat the following day. If it was a bath night, she would bathe HA and the younger of Maurice's children. She stated that "Maurice would either still be in his office or not home." If he were home, she would direct the children to say goodnight to him. Most times, he would not come up to assist her in putting the children to bed. When she put the children to bed, she would sing them songs or read them books. Anika stated that, at that time, it would be around 8:30, 9:00 o'clock, so she would go to bed as well.

Anika testified that, in the evenings, when he was working in Grand Rapids, Maurice would come home around 6:30, but that he would not stay home. She also testified that on Monday, Wednesday, Friday, Saturday, and Sunday, Maurice would leave to play a card game called "Magic: The Gathering." Although it varied, she recalled that on Mondays and Wednesdays, he would go to the card games straight from work. On Fridays, he would sometimes leave the house between 4:00 and 7:00 p.m. She recalled that he would sometimes return at 2:00 a.m., 6:00 a.m., or noon on the following day, but that, oftentimes he would return at 3:00 a.m. On Saturdays, he would leave to play around 1:00 and not return until 3:00 or 4:00 a.m. on Sunday. She added that "typically you wouldn't see him the rest of the day." On Sundays, he might come down to have breakfast, but then he would typically take a nap and sleep most of the day.

The trial court credited Anika's testimony, which shows that Maurice was almost completely uninvolved in providing guidance, discipline, the necessities of life, and parental comfort to HA. HA was a very young child, and, given Maurice's absence from her daily routine and from the environment in general, the trial court's finding that the established custodial environment existed solely with Anika was not against the great weight of the evidence.

## 2. PHYSICAL CUSTODY

Maurice next argues that the trial court erred by granting sole physical custody of HA to Anika. Because Anika's proposed custody change would not alter the established custodial environment, she had to show by a preponderance of the evidence that the change was in HA's best interests. See *Bofysil v Bofysil*, 332 Mich App 232, 243; 956 NW2d 544 (2020). "A trial court must consider the factors outlined in MCL 722.23 in determining a custody arrangement in the best interests of the children involved." *Id.* at 244. On appeal, Maurice challenges the trial court's findings under factors (b), (f), (g), (j), (k), and (*l*).

Factor (b) requires the trial court to consider "[t]he capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any." MCL 722.23(b). The trial court found that this factor favored Anika because Anika was primarily responsible for feeding, bathing, and dressing HA, because Anika tended to HA during the night, and because Maurice did not show interest when HA was tested for COVID-19. The court also noted that there was no testimony concerning who tended to HA when she was sick and that HA was not enrolled in school or extracurricular activities. Although those findings were supported by the record, Maurice argues that this factor should have favored the parties equally.

Maurice testified that he would lie with HA on his chest and that he would sing to her, and he stated that he openly showed affection to HA. Anika testified that she would hug and kiss HA, and that they would snuggle. Maurice testified that he tried to teach his daughters that "they're powerful, they're strong, they're beautiful" and that he put effort into teaching his children that, as African Americans, they would need to work extra hard to make it in life. With regard to discipline, Maurice testified that he believed in spanking children and that he would use physical punishments for his older children such as push-ups, sit-ups, wall sits, and making them walk up and down the stairs. Maurice testified that Anika had spanked HA twice but that he thus far, because of her age, had only given her time-outs. The trial court, however, found Anika credible.

Anika testified that she did not believe in physical punishments, whereas Maurice would spank his children with a belt. She recalled that Maurice once spanked his three-year-old with a belt so many times that she urinated in her clothing, and he forced her to eat her dinner in the urine-soaked clothes in order to teach her a lesson. Anika testified that Maurice would force his children to walk on a treadmill and that he made one of his children do this to lose weight. In light of this testimony, particularly the testimony pertaining to Maurice's disciplinary practices, it cannot be said that the court's finding that this factor favored Anika was against the great weight of the evidence.

Factor (f) requires the court to consider the moral fitness of the parties. MCL 722.23(f). The court found that this factor favored Anika. When considering this factor, courts must consider moral fitness only in the context of the parent-child relationship. *Fletcher v Fletcher*, 447 Mich 871, 887; 526 NW2d 889 (1994). "[A] a spouse's questionable conduct is relevant to factor f only if it is a type of conduct that necessarily has a significant influence on how one will function *as a parent*." *Id*. "Thus, the question under factor f is not 'who is the morally superior adult;' the question concerns the parties' relative fitness to provide for their child, given the moral disposition of each party as demonstrated by individual conduct." *Id*.

In finding that this factor favored Anika, the trial court found that Maurice had engaged in extramarital affairs. Although not normally a reliable indicator of how one would function with the parent-child relationship, the record in this case reflects that Maurice was having an affair in part to punish Anika for getting an abortion. Moreover, the trial court found that Maurice perpetrated domestic violence, including physical and emotional abuse against Anika. Some of the incidents of domestic violence occurred while Anika was pregnant, while others occurred while HA was present. Maurice also pleaded guilty to domestic violence and malicious use of an electronic device as a result of an incident with his ex-wife.[2] Finally, there was also testimony that when returning items of personal property to Anika, he dumped all the items on the ground near her vehicle. Anika recalled that there were strangers in the vicinity and that the whole incident

---

[2] At trial, Maurice insisted that the only reason he pleaded guilty was because Anika did not want to go through a trial with him while she was pregnant with HA. He claimed that the basis for the charges was not his own conduct; rather, the judge that issued a PPO in favor of his ex-wife orally permitted his behavior even though the written order prohibited his conduct. Finally, he believed that his ex-wife only brought the charges because shortly after he broke up with her he married Anika.

was humiliating. HA was present during this incident. In light of the above, the trial court's finding that this factor favored Anika was not against the great weight of the evidence.

The court also found that factor (g)—which addresses the "mental and physical health of the parties involved"—favored Anika. That finding was not against the great weight of the evidence. Maurice admitted that he suffered from chronic injuries that were sustained during his military service. He claimed that these injuries did not interfere with his ability to parent, but Anika testified that there were days when the pain was too debilitating for him to function. She explained:

> It's definitely affected his abilities. You know, he can't control the weather, he can't control the pain. When it comes, it comes, and sometimes it has knocked him out completely to where he's had to take medication and needed help getting the medication, getting into bed. And when he's in bed, he's in there for—until he feels better.
>
> And it's happened quite a few times in our marriage that, you know, he was just down, and you had to let the kids know, like, "Daddy can't play right now." Like, "Daddy needs his rest." He'll go lay down, and, you know, I do what I can to help.

Moreover, Maurice suffered from adjustment disorder, and Anika testified that this caused him to have outbursts and anxiety attacks when faced with stressful situations.

Maurice next argues that the trial court erred by finding that factor (j) favored Anika. Factor (j) requires the court to examine:

> The willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents. A court may not consider negatively for the purposes of this factor any reasonable action taken by a parent to protect a child or that parent from sexual assault or domestic violence by the child's other parent. [MCL 722.23(j).]

The court found that this factor favored Anika because Maurice was unwilling to communicate and was unwilling to cooperate with the parenting-time schedule. Maurice was routinely late for parenting time exchanges by at least 10 minutes, and there was one incident in which he was 45 minutes late but did not notify Anika that he was running behind. During another exchange, as explained above, he dumped a bag of Anika's clothing in the parking lot. Finally, he steadfastly testified that if he received the parenting-time schedule of his choice, he would be willing to cooperate by moving the exchange location to a location that would result in a more equitable travel time between the parties, and he would also be willing to shift the time of the exchange to earlier in the day so that HA could be transported to Anika's home before her bedtime. However, he was unwilling to make any concessions until and unless he received the exact schedule that he desired. In light of this testimony, the trial court's finding that this factor favored Anika was not against the great weight of the evidence.

The trial court also did not err by finding that factor (k) favored Anika. Factor (k) requires the court to consider "[d]omestic violence, regardless of whether the violence was directed against or witnessed by the child." MCL 722.23(k). As explained above, on New Year's Eve in 2016, Anika attempted to stop Maurice from leaving home just before midnight, so he slammed her against the bathroom wall. In August 2017, Maurice shoved Anika on the ground and she hit her head on the floor. In August 2018, he flipped a bench against the wall during an argument, causing HA to cry, and he refused to let Anika leave the room to go and comfort HA. He then threatened to kill Anika if she called the police. In September 2019, Maurice swung Anika's laptop at her and hit her arm. Finally, on July 12, 2020, Anika punched Maurice several times after he admitted to having had multiple affairs and indicated that he did not intend to stop. He then pinned Anika on the ground and threatened to kill her. He also candidly admitted that if HA had not been present he would have "knocked the slam out of" Anika. In addition to the physical altercations, Anika testified that Maurice would also emotionally abuse her by calling her fat and making her feel worthless. The trial court's findings on factor (k) were not against the great weight of the evidence.

Finally, Maurice argues that under factor (*l*), the catch-all provision, the trial court should have considered that HA was close with Maurice's parents and other children and that Maurice was an excellent father to the other children. However, these are circumstances that are adequately covered by the other factors that the court considered. HA's relationship with Maurice's relatives could be considered under factors (d) and (e), while his parenting of his other children could be considered under factors (b) and (c). Thus, the trial court did not err by declining to consider additional factors.

In light of the above discussion of the best-interest factors, the trial court did not abuse its discretion by awarding Anika sole physical custody of HA.

## 3. LEGAL CUSTODY

When determining legal custody, in addition to considering the best-interest factors, the court should consider "[w]hether the parents will be able to cooperate and generally agree concerning important decisions affecting the welfare of the child." MCL 722.26a(1)(b). The best-interest factors discussed above support the court's award of sole legal custody to Anika, particularly because of the allegations of domestic violence that the court found credible. There was also evidence that Maurice was unwilling to cooperate with Anika. Anika testified that she and Maurice could not "agree on anything," that Maurice does "what he wants to do when he wants to do it," and that Maurice was unwilling to compromise. Throughout his testimony, Maurice supported her view of his cooperation. He testified that he had extramarital affairs and, when asked if he was cheating he would respond, "If I'm—are you leaving me if I cheat? No? Okay, then it doesn't really matter, and that's the end of it." And, as recounted above, he persistently testified that he would only be willing to adjust the parenting time exchange location and the time of the pick-up/drop-off if he received the custody arrangement he wanted. In light of the above, the trial court did not abuse its discretion by awarding Anika sole legal custody.

## 4. PARENTING TIME

Next, Maurice argues that the parenting-time determination was erroneous. When determining the parenting time schedule, courts are directed to consider seven statutorily

enumerated factors. MCL 722.27a(7). Maurice does not challenge the trial court's findings under any of these factors; rather, his sole argument is that the trial court erred by failing to follow the Michigan Parenting Time Guidelines. Maurice has not offered any authority in support of the assertion that courts are bound to follow the parenting time guidelines. Indeed, the guidelines carry the proviso that they are "not the law," and are instead, a tool designed "to help parents create a parenting time schedule in the best interests of their child." Because the trial court was required to make the determination based on the analysis of the factors set forth in MCL 722.27a(7), and not the rigid application of a set of non-binding guidelines, and because Maurice had made no challenge to the court's findings related to the statutory factors, we find no merit in his challenge to the parenting-time determination.

## III. PERSONAL PROPERTY LEFT IN MARITAL HOME

### A. STANDARD OF REVIEW

Maurice argues that the trial court erred by valuing personal property left in the marital home at $5,000 without having it appraised. "This Court reviews a property distribution in a divorce case by first reviewing the trial court's factual findings for clear error, and then determining whether the dispositional ruling was fair and equitable in light of the facts." *Olson v Olson*, 256 Mich App 619, 622; 671 NW2d 64 (2003). "A finding is clearly erroneous if, after reviewing the entire record, we are left with the definite and firm conviction that a mistake was made." *Loutts v Loutts*, 298 Mich App 21, 26; 826 NW2d 152 (2012).

### B. ANALYSIS

This issue pertains to personal property that remained in the marital home after Anika left. Those items included treadmills, a snow blower, a lawn mower, an edger, linens, a kitchen table and chairs, a washer and dryer, a computer, a printer, a shredder, and collectable cards. The trial court valued this personal property at $5,000 and awarded it to Maurice. Maurice argues that the trial court should have had the property appraised. "Generally, the party seeking to include a [piece of property] for distribution in the property settlement bears the burden of proving the reasonably ascertainable value of the [property]." *Magee v Magee*, 218 Mich App 158, 165; 553 NW2d 363 (1996). However, the trial court's finding that Anika had no reasonable means to ascertain the value of this property was supported by the evidence. After Anika left the home, Maurice changed the locks and refused to allow Anika to access the home even to retrieve her winter clothing. Even when Anika obtained a court order commanding Maurice to grant her access to the home to retrieve her winter clothing, he nonetheless locked most of the doors, and he left out a bag filled with the belongings he felt that she needed.

Having been left with no reasonable means to ascertain the value of the property, Anika prepared an exhibit identifying the property and stating what she believed each piece of property was worth. Although Maurice acknowledged that a few of the items had a value of $1,000, he believed that the value should be set to zero solely because the items, which were in his possession, had not been professionally appraised. However, the failure to have an appraisal was not dispositive in light of the court's finding that Anika had no reasonable means to ascertain the value of this property, and the value attributed to the property by the court was supported by Anika's

testimony and exhibit showing their worth to be $5,000. Therefore, the court's valuation of this property was not clearly erroneous.

## IV. INCOME CALCULATION

### A. STANDARD OF REVIEW

Maurice next contends that he is entitled to have his child support recalculated because the trial court miscalculated his income. A trial court's factual findings underlying its determination of a child support award are reviewed for clear error. *Stallworth v Stallworth*, 275 Mich App 282, 284; 738 NW2d 264 (2007).

### B. ANALYSIS

Maurice argues that the trial court miscalculated his income. With respect to child support, the trial court found Maurice's annual income to be $180,531.96. This was the amount that was calculated by the Friend of the Court investigator and entered into the initial child support order. The referee described Maurice's testimony regarding his income as "incredibly unclear" and therefore concluded that, while there were "lingering questions" pertaining to his income, Maurice failed to establish that he was entitled to have his child support recalculated. The trial court affirmed the referee's decision, describing Maurice's testimony pertaining to finances as "intentionally vague and misleading."

At the referee hearing, Maurice testified about his profession: "I'm an accountant. I do work—to be honest, I'm an accountant, I'm an IT guy, a data analytics guy. I do—I teach program—some programming languages, things like that. I teach financial analysts, and I do some traditional accounting things." Maurice testified about doing work as both a contractor and an employee for several organizations including Wyzant, Gayanga, and Robert Half. He stated that his wages ranged from $33 to $75 per hour. Maurice received disability benefits from the VA in the amount of $3,800 each month. He also received income from work as a private tutor, but the record is not clear on how much he received from this. Anika believed, based on her conversations with Maurice during the marriage, that Maurice routinely made more than $1,500 a month from tutoring. Finally, Maurice offered particularly confusing testimony as it pertained to a rental property he owned in North Carolina. Anika testified that this property was a source of income, but Maurice insisted that he took a loss. He testified that he was not sure how much he was currently charging for rent, but, when repeatedly pressed, said that it fell somewhere between $800 and $1,100 per month. Maurice was not sure if his tenant had been paying rent because of the pandemic. Ultimately, Maurice never produced any documentation pertaining to the income or expenses relating to this property.

Given the confusing and conflicting nature of the evidence, the trial court's findings pertaining to Maurice's income were not clearly erroneous.

## V. ATTORNEY FEES

### A. STANDARD OF REVIEW

Maurice argues that the trial court erred by ordering him to pay Anika's attorney fees. This Court reviews "a trial court's grant or denial of attorney fees for an abuse of discretion." *Reed v Reed*, 265 Mich App 131, 164; 693 NW2d 825 (2005).

## B. ANALYSIS

With respect to attorney fees, Michigan follows the "American Rule," under which "attorney fees are not recoverable as an element of costs or damages unless expressly allowed by statute, court rule, common-law exception, or contract." *Id*. In domestic relations cases, a party may recover attorney fees if the party establishes that "the party is unable to bear the expense of the action, including the expense of engaging in discovery appropriate for the matter, and that the other party is able to pay . . . ." MCR 3.206(D)(2).

The trial court awarded Anika $17,000 in attorney fees. Maurice does not dispute the trial court's finding that Anika was unable to bear the expense of this action. Rather, he argues that he did not have the ability to pay the fees. Maurice does not support this assertion with any offer of proof concerning his finances or with any citation to the record. The record, however, reflects that Maurice's income was substantially higher than Anika's. Anika was working 40 hours a week and was being paid $16 per hour. The trial court found that Maurice made approximately $180,000 annually, and even Maurice admitted that his annual income exceeded $100,000. At trial, Maurice did not offer any evidence pertaining to his expenses that would render his income inadequate to cover these fees, and on appeal he makes no such offer of proof. Therefore, the court's finding that Maurice could pay Anika's attorney fees was not clearly erroneous.

Affirmed. Anika may tax costs as the prevailing party. MCR 7.219(A).

/s/ Thomas C. Cameron
/s/ Michael J. Kelly
/s/ Douglas B. Shapiro