# STATE OF MICHIGAN

# COURT OF APPEALS

MICHELLE PERNA,

        Plaintiff-Appellee/Cross-Appellant,

v

ANTHONY PERNA,

        Defendant-Appellant/Cross-
        Appellee.

UNPUBLISHED
August 9, 2016

No. 326256
Monroe Circuit Court
LC No. 11-035279-DO

Before: K. F. KELLY, P.J., and M. J. KELLY and Ronayne Krause, JJ.

PER CURIAM.

Defendant appeals as of right a judgment of divorce, arguing that the trial court erred in ordering him to pay spousal support. Plaintiff cross-appeals the same order, arguing that the trial court erred in failing to order defendant to pay plaintiff's attorney fees. Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS

Plaintiff was 45 years old at the time of trial and defendant was 43. Plaintiff has three adult children from a prior marriage. The parties began dating in December 2002 and lived together for a few years before getting married on July 1, 2005. They resided in a home that defendant had acquired before the marriage.

Plaintiff was a registered nurse and earned approximately $60,000 a year. When they were first married, defendant worked at Ford Motor Company's Monroe plant where he earned over $100,000 a year as a material handling supervisor. When the Monroe plant closed he took a position with Neapco for approximately one year. His base salary was the same, but Neapco did not pay overtime, so he earned substantially less, approximately $1,000 a week. The parties decided that defendant should stop working at Neapco and start working full time at a restaurant that they had invested in – Dolce Vita. Even when he stopped working at Neapco, defendant continued to deposit $1,000/week in their joint account. In spite of their combined income, the parties were living paycheck-to-paycheck; they had plenty of money to enjoy eating out and visiting casinos, but did not save.

In 2007, the parties purchased their share of the restaurant with a $300,000 loan from Monroe Bank & Trust. The only way that they could obtain such a loan was if plaintiff's father,

-1-

Dr. Daniel J. Cousineau, was included as a borrower, placing a building where he and his wife practiced orthodontics as collateral for the loan. Although listed as a borrower, neither Cousineau nor the parties expected that Cousineau would actually share in owning the restaurant; they merely considered him a guarantor. Cousineau and the parties entered into an agreement whereby the parties agreed that they would reimburse Cousineau if at any time he had to make payments on the loan. The agreement provided that defendant would take out a life insurance policy, but defendant testified that his attempt to secure life insurance failed. The loan was refinanced in 2009 and again in 2012. The parties also took out a second mortgage with Waterford Bank on defendant's home in the amount of $69,000 to help further finance the restaurant. Plaintiff, who was not on the title to the home and was not an obligor on the first mortgage, was an obligor with defendant on the second mortgage.

The parties made all the payments on the loans while they were married. The plan was for the restaurant to make the loan payments, but it was soon apparent that the restaurant could not afford to do so. Whereas in 2007 defendant believed that buying an interest in the restaurant was a sound decision based on his prior dealing with the Cangelosis, defendant testified that he now believed that the Cangelosis lied about the restaurant's profitability and that the financials were far worse than originally presented. The restaurant was "almost closed" when Tony Sacco (Sacco), who was one of the restaurant's original investors, indicated that he was willing to come back as an owner. Sacco replaced the Cangelosis as defendant's partner. Defendant and Sacco began a limited liability company – Nino & Nick's, LLC.[1] They also decided to open a pub-like restaurant in a shared space with Dolce Vita to add another revenue stream for the people who might not be able to afford Dolce Vita's prices.

After the parties separated in October 2011, they decided to each make one half of the monthly payments due on the $300,000 loan. However, there came a time in April 2012 when plaintiff was unable to pay for her portion of the loan and had to ask Cousineau to pay her half. Defendant stopped paying on his portion in June 2013 and thereafter Cousineau began paying the whole amount. Cousineau testified that he had used funds intended for his retirement to pay the loan and he had no intention to gift the money to either plaintiff or defendant. The parties still owed $158,000 on the loan.

Defendant testified that he grossed $655.88/week with Nino & Nick's LLC, which was a significant reduction from his prior earnings. Prior to September 2013, he had been paid $1,311/week. Defendant testified that it was not unusual for the restaurant to be behind in rent, taxes and utilities. In late 2013, there was a "cash call" for the members to each contribute $50,000. Sacco contributed $76,000 from a loan he acquired from Waterford Bank. Defendant was unable to contribute, thus the reduction in his salary. After defendant took the pay cut from the restaurant in September 2013, he could no longer maintain his monthly expenses and had to file for bankruptcy. Defendant's truck was repossessed and he cashed in his retirement account to make payments on personal expenses.

---

[1] The parties and the trial court seem to use Nick & Nino's and Nino & Nick's interchangeably. Nick is one of Sacco's sons.

Defendant sought bankruptcy protection in January 2014. He acknowledged that the bankruptcy filing from January 16, 2014 did not accurately report his income. Defendant further admitted that he hoped to reaffirm the first mortgage on the home and had just leased the house without advising the bankruptcy trustee of the arrangement. During cross-examination, defendant was confronted with a promissory note that indicated the restaurant owed him $265,000, which he did not include in his accounts receivable until after the trustee brought it to his attention.[2]

Defendant claimed to work 85 to 90 hours a week. Defendant also worked at Mulvaney's Bunker Irish Pub, which he claimed was owned by "a group of investors and Tony Sacco." Defendant testified that he worked there whenever and wherever Sacco told him to: "I'm doing it to keep my job with my partner so he don't push me out of what I do have left. I'm going to do whatever he says right now." Although defendant denied ownership in Mulvaney's, he was confronted with video interviews wherein he was referred to as Mulvaney's owner. Although defendant claimed that Sacco had an ownership interest in Mulvaney's, the ownership disclosure information from the Secretary of State did not include Sacco. Defendant also denied having any interest in Detroit Dogs. He testified that he only helped train employees and that it was actually Sacco's business. However, the Detroit Dogs Facebook page directs inquiries to defendant's cell phone number and email address. Defendant also helped Tiffany Sacco with another of Sacco's restaurants— Tiffany's Pizza.

Plaintiff testified that she continued to help her children with college tuition, car insurance and other expenses. Plaintiff had to borrow from her parents to meet her expenses. Plaintiff testified that she had to quit smoking because she could no longer afford cigarettes. She could no longer afford to shop or dine out. Prior to their separation, plaintiff and defendant did a lot of "fun things," including dining out and going to the casino. They always had money, nice cars to drive and "the best of everything." Plaintiff wanted no interest in the restaurant and, likewise, did not want to be responsible for any of the debts associated with the restaurant. Plaintiff was asking for enough alimony to cover the payment on the loans.

In its February 10, 2015 order, the trial court noted that defendant's January 2014 bankruptcy schedule showed that his gross monthly income was $5,681, which he affirmed under oath at a creditor's meeting, but that defendant testified at trial that the affirmations were incorrect and that he actually earned $655.88 a week. The trial court observed: "Defendant's various and inconsistent representations in his bankruptcy schedules cast serious doubt on his credibility." The trial court further added that it was "left with nothing but suspicion about Defendant's dealings with Sacco, Mulvaney's Bunker, and Detroit Dogs." The trial court concluded that as a result of corrupted or destroyed financial information, it would draw a negative inference against defendant regarding the restaurant's value.

The trial court looked to the marital debts and concluded that Cousineau's "role or interest in the outcome of this case as irrelevant, except as it provides a possible bias affecting

---

[2] When the second day of trial resumed, defendant's attorney indicated that defendant had hired a new bankruptcy attorney. Defendant would file at least five amendments to the schedules.

Plaintiff's testimony as she is certainly interested in seeing her father restored and held harmless on the loan." The parties clearly intended that Cousineau be reimbursed in the event that Cousineau paid on the $300,000 loan. The other marital debt was the $67,000 second mortgage on defendant's home that helped finance the restaurant. While defendant sought to reaffirm the original mortgage, he sought to discharge the second mortgage, leaving plaintiff with the full debt. In determining the value of the only marital asset, the trial court noted:

> Plaintiff has no desire to take ownership of the restaurant. Defendant has no interest in paying the debts that allowed the parties to purchase the restaurant. Defendant represented to the bankruptcy court that the interest in the restaurant is worthless. Plaintiff states that the restaurant is and has always been a cash cow. Neither can be correct. Plaintiff offers no explanation for the fact that a second mortgage was necessary to keep the restaurant afloat. Defendant offers no explanation for why he works up to 90 hours per week, including at restaurants in which he has no interest, for a restaurant that has no value. The Court therefore concludes that the truth is somewhere in the middle.

On the issue of spousal support, the trial court ultimately concluded that defendant should pay plaintiff spousal support in the amount of $2,000 a month until he paid a total of $183,200, which represented approximately half of the combined debt. The trial court declined plaintiff's request that the court order defendant to maintain life insurance in the amount of the spousal support. The trial court declined each party's request for attorney fees.

## II. SPOUSAL SUPPORT

Defendant argues that the trial court's spousal support award was for the benefit of a third party – Cousineau – and was, therefore, inappropriate. Defendant further argues that plaintiff failed to demonstrate that she was entitled to spousal support where she could cover her monthly expenses. Plaintiff argues that while the spousal support award was appropriate, the trial court erred in denying plaintiff's request to secure the support award with life insurance. We disagree with each of these arguments.

Our Court has detailed the standard of reviewing a spousal support award:

> It is within the trial court's discretion to award spousal support, and we review a spousal support award for an abuse of discretion. . . . An abuse of discretion occurs when the trial court's decision falls outside the range of reasonable and principled outcomes. The object in awarding spousal support is to balance the incomes and needs of the parties so that neither will be impoverished; spousal support is to be based on what is just and reasonable under the circumstances of the case. We review for clear error the trial court's factual findings regarding spousal support. A finding is clearly erroneous if, after reviewing the entire record, we are left with the definite and firm conviction that a mistake was made. If the trial court's findings are not clearly erroneous, we must determine whether the dispositional ruling was fair and equitable under the circumstances of the case. We must affirm the trial court's dispositional ruling unless we are convinced that it was inequitable. [*Loutts v Loutts*, 298 Mich App

21, 25-26; 826 NW2d 152 (2012) (internal quotation marks and citations omitted).]

MCL 552.23(1) provides:

Upon entry of a judgment of divorce or separate maintenance, if the estate and effects awarded to either party are insufficient for the suitable support and maintenance of either party and any children of the marriage who are committed to the care and custody of either party, the court may also award to either party the part of the real and personal estate of either party and spousal support out of the real and personal estate, to be paid to either party in gross or otherwise as the court considers just and reasonable, after considering the ability of either party to pay and the character and situation of the parties, and all the other circumstances of the case.

While a trial court's decision to award spousal support is not subject to any rigid formula and should reflect what is reasonable and just under the circumstances of each case, *Loutts*, 298 Mich App at 30, a trial court should consider:

(1) the past relations and conduct of the parties, (2) the length of the marriage, (3) the abilities of the parties to work, (4) the source and amount of property awarded to the parties, (5) the parties' ages, (6) the abilities of the parties to pay alimony, (7) the present situation of the parties, (8) the needs of the parties, (9) the parties' health, (10) the prior standard of living of the parties and whether either is responsible for the support of others, (11) contributions of the parties to the joint estate, (12) a party's fault in causing the divorce, (13) the effect of cohabitation on a party's financial status, and (14) general principles of equity. [*Myland v Myland*, 290 Mich App 691, 695; 804 NW2d 124 (2010), quoting *Olson v Olson*, 256 Mich App. 619, 631, 671 NW2d 64 (2003).]

In order to aid in appellate review, a trial court should make specific factual findings as to each of the relevant factors. *Myland*, 290 Mich App at 695.

Addressing plaintiff's claim for spousal support, the trial court noted that defendant claimed monthly expenses in the amount of $3,485 and that plaintiff claimed $5,437.24 in monthly expenses. The trial court determined that the past relations and conduct of the parties and their prior standard of living were largely irrelevant. It considered the source and amount of property awarded to the parties and noted that defendant would leave the marriage with virtually no debt and the parties' only marital asset. In contrast, plaintiff would have no marital asset and be saddled with the debt. In considering the parties' ability to work and pay, the trial court noted that although both parties had worked throughout the marriage, defendant had always earned more than plaintiff. The trial court noted that "[d]espite his claim of poverty and recent bankruptcy filing, Defendant has ample resources and the ability to pay Plaintiff spousal support, including his disclosed wages of $68,172 per year, his rental income of $26,400 per year, and likely undisclosed income form Nick & Nino, LLC, Mulvaney's Bunker, and Detroit Dogs." The trial court concluded that, if anything, defendant was purposefully reducing his income in order to avoid paying spousal support. With regard to plaintiff's need, the trial court noted that

-5-

plaintiff was unable to meet all of her obligations and was currently relying on Cousineau's help. Quite simply, plaintiff's expenses "including the loans that Defendant has ceased to pay and seeks to discharge, exceed her income." The trial court noted that both parties had contributed to the joint estate, but only defendant would receive an asset. Therefore, on the issue of spousal support, the trial court ultimately concluded:

> The Court holds that Defendant shall pay Plaintiff modifiable spousal support for her support and maintenance in the amount of $2,000 per month until he has paid a total of $183,200, which amount roughly approximates half of the second mortgage plus half of the $300,000. [The Court recognizes that this determination deprives Defendant of credit for amounts he helped to pay down on the $300,000 loan, but also leaves Plaintiff responsible for all of the interest paid and yet to be paid. Under the circumstances, the Court does not see a method for allocating past and future interest, and therefore has settled upon this determination.] The Court declines to hold Defendant fully responsible for the amounts of the two debts. Plaintiff's claims that the restaurant is essentially minting money for Defendant can not [sic] be completely true, as the parties secured a second mortgage in 2009 to support the restaurant, roughly two years after they had been involved in the restaurant operations and two years before Plaintiff filed for divorce. Furthermore, if Plaintiff has truthfully described the lifestyle that she and Defendant lived while they owned the restaurant, then Plaintiff benefitted well from the income of the restaurant. She either is partially responsible for a bad business decision (buying the restaurant) or lived well off that decision rather than paying down the loan. While Plaintiff requests that the Court order Defendant to maintain life insurance in the amount of the spousal support, the Court declines to do that because the parties did not insure Defendant's life when they were together.

Contrary to defendant's assertions, the trial court's spousal support award was not aimed at benefiting Cousineau. In fact, the trial court specifically concluded that it considered Cousineau's involvement largely irrelevant. The simple fact was the parties took out the $300,000 loan in order to purchase the restaurant, knowing and expecting that they, alone, were responsible for the debt. The restaurant was a marital asset and the debts that went into acquiring that asset were jointly held by plaintiff and defendant. The trial court's findings in this regard were not clearly erroneous. Nor did the trial court err when it stated that, as a result of defendant's bankruptcy, plaintiff was now "solely" responsible for the debts. That defendant hoped to discharge his debts in bankruptcy does not change the fact that the restaurant and its debts were marital property.

Additionally, contrary to defendant's arguments, plaintiff did not testify that she could meet her monthly obligations. Plaintiff testified that she could afford her monthly expenses *with the exception of paying the loan amounts.* In fact, at the time of trial, Cousineau was making the full payment on the loan. Defendant's claim that the trial court erred in including those amounts in determining plaintiff's monthly expenses is specious, especially now that plaintiff is solely responsible for the debts. Defendant seems to think that Cousineau will simply forgive his daughter of these debts, but there is no evidence in the record to support such a contention. Cousineau, plaintiff and defendant agreed that Cousineau expected, and was entitled to,

-6-

repayment. It is obvious that the trial court in this case attempted to balance the incomes and needs of the parties and its ultimate award was just and reasonable under the circumstances of the case.

However, the trial court did not abuse its discretion when it declined plaintiff's request to secure the support award with life insurance. Plaintiff's reliance on MCL 552.27 is misplaced. The statute provides:

> If alimony . . .is awarded to either party, the amount of the alimony . . .constitutes a lien upon the real and personal estate of the adverse party . . .. The court may do 1 or more of the following *if the party defaults* on the payment of the amount awarded:
>
> (a) Order the sale of the property against which the lien is adjudged in the same manner and upon the same notice as in suits for the foreclosure of mortgage liens.
>
> (b) Award execution for the collection of the judgment.
>
> (c) Order the sequestration of the real and personal estate of either party and may appoint a receiver of the real estate or personal estate, or both, and cause the personal estate and the rents and profits of the real estate to be applied to the payment of the judgment.
>
> (d) Award a division between the husband and wife of the real and personal estate of either party or of the husband and wife by joint ownership or right as the court considers equitable and just. [MCL 552.27 (emphasis added).]

The statute does not support plaintiff's claim that she was entitled to an order requiring defendant to secure a life insurance policy. The statute applies when a party is in default.

### III. ATTORNEY FEES

Plaintiff argues that the trial court abused its discretion when it denied her request for attorney fees. We disagree.

"We review for an abuse of discretion a trial court's award of attorney fees in a divorce action . . . However, findings of fact on which the trial court bases an award of attorney fees are reviewed for clear error." *Richards v Richards*, 310 Mich App 683, 699-700; 874 NW2d 704 (2015).

MCL 552.13(1) provides that a trial court *may* require a party "to pay any sums necessary to enable the adverse party to carry on or defend the action." Likewise, MCR 3.206(C) provides:

> (1) A party may, at any time, request that the court order the other party to pay all or part of the attorney fees and expenses related to the action or a specific proceeding, including a post-judgment proceeding.

(2) A party who requests attorney fees and expenses must allege facts sufficient to show that

(a) the party is unable to bear the expense of the action, and that the other party is able to pay, or

(b) the attorney fees and expenses were incurred because the other party refused to comply with a previous court order, despite having the ability to comply.

In a divorce action, attorney fees are "awarded only as necessary to enable a party to prosecute or defend a suit but are also authorized when the requesting party has been forced to incur expenses as a result of the other party's unreasonable conduct in the course of litigation." *Richards*, 310 Mich App at 700 (internal quotation marks omitted). As such, "MCR 3.206(C)(2) provides two independent bases for awarding attorney fees and expenses . . .Whereas MCR 3.206(C)(2)(a) allows payment of attorney fees based on one party's inability to pay and the other party's ability to do so, MCR 3.206(C)(2)(b) considers only a party's behavior, without reference to the ability to pay." *Richards*, 310 Mich App at 700.

In denying the parties' request for attorney fees, the trial court simply noted that it "has considered each party's request and circumstances, and does not find that either party is in a better position to pay than the other. Furthermore, the Court does not find that Defendant is responsible for running up litigation expenses. Therefore, both requests are denied, and the parties shall each be responsible for their own attorney's fees."

It cannot be said that the trial court clearly erred or abused its discretion when it found that neither party was in a better position to pay than the other. Plaintiff had incurred substantial attorney fees, but she also had a consistent and stable income of $60,000 as a registered nurse. Defendant was in the process of declaring bankruptcy. Additionally, the trial court did not clearly err or abuse its discretion when it concluded that defendant had not run up litigation expenses. A review of the record reveals that, contrary to plaintiff's arguments, the delay in bringing this case to trial was not solely attributable to defendant. Moreover, while defendant may have lied about his income and may have had something to do with lost computer files, the trial court clearly took these matters into consideration when it judged defendant's credibility, imputed additional income, and drew a negative inference against defendant. There was no evidence that plaintiff's attorney fees and expenses were incurred because defendant refused to comply with a previous court order.

Affirmed. Neither party having prevailed in full, no costs are taxed. MCR 7.219.

/s/ Kirsten Frank Kelly
/s/ Michael J. Kelly
/s/ Amy Ronayne Krause